**CAVALIER OIL CORPORATION, a corporation of the State of Delaware, Plaintiff Below, Appellant, Cross-Appellee,**

v.

**William J. HARNETT, an individual, Defendant Below, Appellee, Cross-Appellant.**

Supreme Court of Delaware.

Submitted March 28, 1989.
Decided Sept. 5, 1989.

James F. Harker, Herlihy & Wier, Wilmington, John R. Fornaciari, P.C. (argued) and Robert M. Disch, Eckert, Seamans, Cherin and Mellott, Washington, D.C., for appellant, cross-appellee.

James M. Mulligan, Jr. and Collins J. Seitz, Jr., Connolly, Bove, Lodge & Hutz, Wilmington, Thomas Earl Patton (argued), Brett L. Antonides, and Mitchell R. Kreindler, Schnader, Harrison, Segal & Lewis, Washington, D.C., for appellee, cross-appellant.

Before HORSEY, WALSH and HOLLAND, JJ.

WALSH, Justice:

This is an appeal by Cavalier Oil Corporation ("Cavalier") and a cross-appeal by William J. Harnett ("Harnett") from a final

judgment of the Court of Chancery determining the fair value of 1,250 shares of stock owned by Harnett in EPIC Mortgage Servicing, Inc. ("EMSI"), a closely-held Delaware corporation. The appraisal action followed a short form merger, pursuant to 8 *Del.C.* § 253, of EMSI into Cavalier on November 20, 1984.

Harnett rejected Cavalier's offer of $93,-950 for his EMSI shares, electing instead to assert his appraisal rights under 8 *Del.C.* § 262. Consolidated appraisal proceedings were tried in the Court of Chancery which, after extensive post-trial briefing, entered judgment fixing the value of Harnett's EMSI stock at $347,000.[1] This appeal and cross-appeal resulted.

Cavalier's principal contention on appeal is that the Court of Chancery erred in valuing a corporate opportunity claim asserted by Harnett because the assertion of this claim was barred by *res judicata* and not otherwise assertable in a statutory appraisal proceeding. Cavalier also appeals from the refusal of the Vice Chancellor to apply a minority discount in valuing Harnett's interest in EMSI. Harnett cross appeals from rulings which rejected certain cash flow projections offered by Harnett's financial expert and which refused to consider Harnett's claim that his EMSI shares had been diluted by shares improperly issued to other shareholders.

We conclude that the Court of Chancery, in both its findings and methodology, correctly applied the standards which govern an appraisal proceeding under Delaware law. Accordingly, we affirm the judgment in all respects.

## I

The Court of Chancery appraisal action was the culmination of a complex and litigious business relationship between Har-

nett and the two majority shareholders of Cavalier, Tom J. Billman ("Billman") and Clayton C. McCuistion ("McCuistion"). All three individuals were original investors in Equity Programs Investment Corporation ("EPIC"), a Virginia corporation established in 1975.[2] EPIC's principal business activity was the purchasing of model homes from builders for lease-back purposes. Directly and through subsidiaries, EPIC later expanded into other types of real estate management and mortgage servicing. By 1983, Billman and McCuistion together owned over ninety percent of EPIC's shares while Harnett held the balance of shares.

From its original form, the corporate structure of EPIC changed as various specialized entities were spun off. In 1982, ERSI, which was the companion corporation in the appraisal proceeding, was established as an affiliate of EPIC, with stock ownership reflecting that of the parent. In 1977, EPIC created Epic Mortgage, Inc. ("EMI"), a Delaware corporation, as a subsidiary for servicing mortgages on properties owned by EPIC. In February, 1983, another new subsidiary, also a Delaware corporation, EPIC Mortgage Servicing, Inc. (EMSI), was spun off from EMI and its shares were distributed proportionately. As part of this transaction, EMSI was given the right to service all mortgages in EMI's portfolio. The following month, Community Savings and Loan, Inc. ("CSL"), a Maryland chartered savings and loan association controlled by Billman and McCuistion, effected a merger of EPIC, along with its subsidiary EMI, into CSL. The negotiations between Harnett and the majority shareholders which led to the EPIC–CSL merger were extended and acrimonious.

---

**1.** The Court of Chancery proceedings were consolidated to include the appraisal of Harnett's minority interest in a related company, EPIC Realty Services, Inc. ("ERSI"), which was merged into Realty Services Holdings, Inc., an entity also controlled by the two majority shareholders of Cavalier. Neither party has appealed from those portions of the Vice Chancellor's decision involving ERSI.

**2.** Harnett also filed an action in the Circuit Court of Fairfax County, Virginia, seeking an appraisal of his EPIC shares under Virginia law. The parties have reached a settlement in that proceeding.

Harnett was initially offered only non-convertible, nonvoting preferred shares in CSL in exchange for his EPIC holdings. He rejected this proposal, intent on retaining his proportionate equity interest in EPIC and its progeny. While negotiations ensued, Billman and McCuistion, apparently without Harnett's knowledge, arranged for EMSI to enter into an agreement with EMI under which EMI undertook to perform EMSI's mortgage servicing business, thereby gaining significant revenues which were originally intended to accrue to the spun-off EMSI. Harnett received his certificate for 1,250 shares of EMSI, dated March 2, 1983. Harnett claims that he did not learn of the diversion of EMSI's corporate opportunity until he was notified in November, 1984, of the merger of EMSI into Cavalier and was tendered a check for $93,950 for his stock.

During his ongoing dispute with Billman and McCuistion, Harnett instituted two actions which form the basis for the *res judicata* claim. In October, 1983, Harnett filed suit in the United States District Court for the Eastern District of Virginia, to recover damages for his minority interest in EPIC. *Harnett v. Billman*, C.A. No. 83–1029–A, (E.D.Va., Oct. 13, 1983) ("*Harnett I*"). The amended complaint in *Harnett I* contained five counts: (1) common law fraud, (2) federal securities fraud, (3) RICO violations, (4) state securities fraud, and (5) a shareholder derivative claim. The focus of this action was the alleged misrepresentations and nondisclosures made by EPIC's majority shareholders in connection with the CSL merger.

The factual allegations in *Harnett I* included, *inter alia*, a claim that as a result of the misappropriation of 29,000 shares of EPIC stock by Billman and McCuistion in June, 1982, Harnett's stock in EPIC was improperly diluted, and later, when EMSI was spun off from EPIC on March 1, 1983, his proportionate interest in EMSI was reduced. Harnett sought only damages on his dilution claim.

In October, 1983, Harnett was unaware of the dealings which led to the corporate opportunity claim that he later asserted in the appraisal action. Thus, in *Harnett I*, these facts were not alleged, nor was a claim based upon them. *Harnett I* was dismissed, with prejudice, in February, 1984, pursuant to a settlement agreement executed by the parties. This settlement agreement and the subsequent order of dismissal expressly reserved to Harnett the right "to assert the facts underlying the derivative action of Count V [of the Amended Complaint] as those facts may affect the value of [Harnett's] stock." The Court of Chancery construed this provision, in accordance with the intent of the parties, to include the corporate opportunity claim in Harnett's appraisal action even though those facts were not known to Harnett at the time that *Harnett I* was dismissed.

*Harnett II* was filed in Federal District Court in February, 1985. The complaint in *Harnett II* contained four counts: (1) federal securities law violations, (2) state securities law violations, (3) common-law fraud and (4) breaches of fiduciary duty by Billman and McCuistion, as majority shareholders of EMI, EMSI and Cavalier. The District Court eventually awarded damages on Harnett's common-law fraud claim, but granted summary judgment as to Harnett's other three claims finding, alternatively, that they were barred by the doctrine of *res judicata* and that they were subsumed within the previous order of dismissal. On appeal, the Fourth Circuit Court of Appeals, while not disturbing the findings of the District Court, reversed the award of damages on the common-law fraud claim on *res judicata* grounds. The Fourth Circuit concluded as a matter of law that the common-law fraud claim could have been known to Harnett and thus should have been asserted by Harnett in *Harnett I*. *Harnett v. Billman*, 4th Cir., 800 F.2d 1308, 1314–16 (1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987).

In the Court of Chancery, Cavalier argued that Harnett's corporate opportunity claim in the appraisal action was precluded by the doctrine of *res judicata*. This assertion was based on the Fourth Circuit's finding, in *Harnett II*, that Harnett's common-law fraud claim was barred by *res judicata*. Harnett, relying on the savings

language in the order of dismissal in *Harnett I*, contended that the corporate opportunity claim was viable.

The Vice Chancellor first ruled that Cavalier had the burden of proving the availability of the affirmative defense of *res judicata*. Without disagreeing with the Fourth Circuit's analysis of the common-law fraud claim raised in *Harnett II*, he addressed the question of whether the facts supporting the corporate opportunity claim were encompassed in the savings provision in the order of dismissal of *Harnett I*. Based on the evidence presented, the Court of Chancery concluded that the parties intended to preserve *all* facts as they may relate to an appraisal action, and that had the corporate opportunity aspect of an appraisal proceeding been raised in *Harnett I*, those facts also would have been saved. In sum, he determined that Cavalier had failed to show why the facts underlying the corporate opportunity aspect of Harnett's appraisal action would have been treated differently from the other facts alleged in count five of the amended complaint in *Harnett I*, had the facts been known to Harnett and raised in *Harnett I*. The Vice Chancellor thus concluded that Cavalier failed to establish a sufficient factual basis for the assertion of its *res judicata* defense.

## II

The resolution of the *res judicata* claim presents, preliminarily, a choice of law issue. The Court of Chancery did not specifically rule on this point but cited both Delaware and Virginia authority in support of its allocation of the burden of proof. Since it raises a question of law, we review the choice of law claim *de novo*. *Fiduciary Trust Co. of N.Y. v. Fiduciary Trust Co. of N.Y.*, Del.Supr., 445 A.2d 927, 930–31 (1982).

■ Because of the mixed setting in which the previous litigation between the parties arose and the assertion of *res judicata* in a Delaware statutory proceeding,

the law of more than one jurisdiction is implicated. Facially at least, Delaware law, Virginia law and federal common law could dictate the law of decision regarding the preclusive effects of the previous litigation in the appraisal action. *Harnett I* and *Harnett II* proceeded on federal law claims accompanied by pendant Virginia state law claims. The facts that underlie the common law fraud count in *Harnett I*, and that, if preserved, form the basis for the corporate opportunity claim asserted in the appraisal action, were first articulated in support of state law claims; thus, their survival for *res judicata* purposes would appear to be controlled by Virginia law.[3] We are required to accord to the order of the District Court the same force and effect as would be given to a ruling of a Virginia Court. *Thompson v. D'Angelo*, Del.Supr., 320 A.2d 729, 734 (1974). We thus focus on the preclusive effect, if any, of settlement and dismissal of *Harnett I* under Virginia law.

■ In *Bates v. Devers*, 214 Va. 667, 202 S.E.2d 917 (1974), the Virginia Supreme Court, in an analogous procedural setting, ruled that under Virginia law the parties to a federal action may agree to dismiss certain claims in litigation, and preserve other claims from the preclusive effect of *res judicata*, if and when the preserved claims are subsequently raised in a state court action. *See id.* The court also ruled that the party seeking to raise the defense of *res judicata* assumed the burden of proving by a preponderance of the evidence that the claim was barred by the prior judgment. *Id.* at 921.

In rejecting Cavalier's *res judicata* contention, the Court of Chancery found that the parties to *Harnett I* intended to preserve all facts which might affect the value of Harnett's stock, including the factual underpinnings of the corporate opportunity claim, even though that claim had not been raised in *Harnett I*. The Vice Chancellor's factual findings have ample support in the

---

**3.** The effect of a valid judgment as a conclusive adjudication between the parties and persons in privity with them on facts which were or might have been put in issue in the proceedings is determined by the law of the state where the judgment was rendered. Restatement, *Conflict of Laws* § 450(2) (1934).

record. The language of both the settlement agreement and the order of dismissal in *Harnett I* reflects the intention of the parties to save an appraisal action, to the fullest extent possible, by preserving all facts which bear upon the value of Harnett's stock. When viewed in the context of our standard of review under *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972), the trial court's factual findings, coupled with the burden of proof imposed upon Cavalier by *Bates v. Devers*, require rejection of Cavalier's *res judicata* claim. The settlement agreement preserved facts, not specific claims or causes of action, and it is those facts underlying the corporate opportunity claim which are assertable in the appraisal action.

Cavalier argues that the Court of Chancery's rejection of the *res judicata* bar is in conflict with the Fourth Circuit's earlier holding that Harnett's claim of diversion of mortgage services between EMI and EMSI was barred by the settlement of *Harnett I's* state law claim for fraud, even though Harnett was unaware of the diversion at the time *Harnett I* was settled. While the Fourth Circuit concluded that the diversion claim was included in the common law fraud claim in *Harnett I,* and thus barred because the claim "also arose out of the same transaction or series of transactions, the various mergers and spin-offs, that were the basis for Harnett's claims in *Harnett I,*" *Harnett v. Billman*, 800 F.2d at 1315 (*Harnett II*), it did so in review of the state law fraud claim, not the agreement preserving Harnett's appraisal right. Indeed, in upholding the District Court's dismissal of the fiduciary duty claims asserted by Harnett against the majority shareholders because Harnett no longer had standing to maintain a derivative action, the Circuit Court noted that the remedy available to a disgruntled minority shareholder in Harnett's situation is the appraisal permitted under Delaware law. Thus, we agree with the Court of Chancery that it was the intention of the parties, as reflected in their stipulation of dismissal, which controlled the scope of *res judicata* in subsequent litigation between the parties. Since the trial court determined, as a matter of fact, that such intention existed, we are bound by that determination, which finds ample support in the record.

### III

■ Having concluded that Harnett's corporate opportunity claim was not subject to the bar of *res judicata*, we next consider the related question of whether such a claim may be asserted by a shareholder incident to a section 262 appraisal proceeding. We agree with the Court of Chancery that, under the circumstances in which such a claim evolved here and in light of the consent of the parties to accord recognition to derivative-like claims for future valuation purposes, the claim was cognizable in an appraisal action.

■ A shareholder who dissents from a cash-out merger is nonetheless entitled to receive the fair or intrinsic value of his shares. Under Delaware law the sole remedy available to minority shareholders in a cash-out merger, absent a challenge to the merger itself, is an appraisal under 8 *Del.C.* § 262. *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 703 (1983). An action seeking appraisal is intended to provide shareholders who dissent from a merger, on the basis of the inadequacy of the offering price, with a judicial determination of the fair value of their shares. *Cede and Co. v. Technicolor, Inc.*, Del. Supr., 542 A.2d 1182, 1186 (1988); *Weinberger v. UOP, Inc.*, 457 A.2d at 714.

■ The standard for determining the "fair value" of the company's outstanding shares was liberalized in *Weinberger*, which broadened the process from the exclusive use of the "Delaware Block" method to include all generally accepted techniques of valuation used in the financial community. *See Cede and Co. v. Technicolor, Inc.*, 542 A.2d at 1186–87; *Weinberger v. UOP, Inc.*, 457 A.2d at 712–13. The scope of the appraisal action is limited, with the only litigable issue being the determination of the value of petitioner's shares on the date of the merger. *Cede and Co. v. Technicolor, Inc.*, 542 A.2d at 1187. Although the justiciable issue in an

appraisal action is a limited one, as this Court held in *Weinberger* "all relevant factors" are to be considered in determining fair value of shares subject to appraisal. *Weinberger v. UOP, Inc.*, 457 A.2d at 713; *see also* 8 *Del.C.* § 262(h). In the present case, the Vice Chancellor concluded that he had authority to determine the corporate opportunity claim because it related to the value of Harnett's EMSI stock. *See Weinberger v. UOP, Inc.*, 457 at 713–14; *Rabkin v. Philip A. Hunt Chemical Corp.*, Del.Supr., 498 A.2d 1099, 1105 (1985).

Cavalier argues that the Court of Chancery's decision to extend the scope of valuation to embrace Harnett's corporate opportunity claim impermissibly expands the appraisal remedy to include questions of breaches of fiduciary duty, contrary to this Court's holding in *Rabkin*. *See Rabkin v. Philip A. Hunt Chemical Corp.*, 498 A.2d at 1106. Fiduciary duty/common law fraud claims have been disallowed in appraisal actions under both *Rabkin v. Phillip A. Hunt Chemical Corp., id.* (unfair dealing claims, based on breaches of the duties of loyalty and care, raise "issues which an appraisal cannot address") and *Weinberger v. UOP, Inc.*, 457 A.2d at 714 (the appraisal remedy may not be adequate in cases involving fraud, misrepresentation, self-dealing, waste of corporate assets, or gross and palpable overreaching). We believe, however, that our previous rulings do not control this case.

While ordinarily a section 262 appraisal proceeding does not lend itself to any claims other than those incident to the appraisal proceeding itself, the unusual facts of this case, particularly the consent of the parties as reflected in the *Harnett I* settlement order providing that the derivative-like claims are viable for appraisal purposes, require that Harnett's corporate opportunity claim be considered in valuing his shares.

Nor is our decision, upholding the viability of a fraud-based claim on the present facts on the appraisal action, to be viewed as undercutting the holding in *Cede*, that derivative claims are lost in subsequent appraisal proceedings because the derivative plaintiff loses his standing to assert these claims on behalf of the corporation. It is true that this Court in *Cede* held that where allegations of fraud and breaches of fiduciary duty exist in connection with a merger, an action separate and distinct from an appraisal proceeding may and indeed must be maintained. *Cede and Co. v. Technicolor Inc.*, 542 A.2d at 1189. *See also Kramer v. Western Pacific Industries, Inc.*, Del.Supr., 546 A.2d 348, 354 (1988). In *Cede* this Court permitted a separate action for fraud in the merger itself because "... an appraisal action may not provide a complete remedy for unfair dealing or fraud ..." in the merger. *Cede and Co. v. Technicolor, Inc.*, 542 A.2d at 1187. The Court in *Cede* also noted that "[a] determination of fair value does not involve an inquiry into claims of wrongdoing in the merger." *Id.* at 1189. Further, this Court held in *Kramer* that "... direct attacks against a given corporate transaction (attacks involving fair dealing or fair price) give complaining shareholders standing to pursue individual actions even after they are cashed out through the effectuation of a merger." *Kramer v. Western Pacific Industries, Inc.*, 546 A.2d at 354.

The wrongdoing alleged by Harnett relates directly to the fair value of his stock, not to the validity of the merger itself. Harnett does not dispute that there was a legitimate business purpose to be served by the merger. His claim relates strictly to the value of his shares, and is the one issue that all of the parties had agreed to preserve. His claim is thus viewed as more personal than derivative and appropriately so, in view of his status as the sole minority shareholder whose claims of fraud are directed against the two controlling shareholders. The EMSI corporate opportunity claim, if considered on its derivative merits, would inure almost entirely to the benefit of the alleged wrongdoers, an inequitable result at variance with the fair value quest of the appraisal proceeding. In the present case a fair value determination in an appraisal action will satisfactorily redress the claimed wrongdoing. Additionally, the Vice Chancellor found that Harnett did not

have knowledge of the basis for the corporate opportunity claim prior to the institution of the appraisal proceeding and that, as a matter of credibility, those claims were based on misrepresentations by the principal shareholders. We conclude that, under the unusual configuration of facts present here, the corporate opportunity claim was assertable in the section 262 proceeding.

■ On the merits of the corporate opportunity claim, the Court of Chancery, in valuing EMSI, viewed the combined EMSI/EMI mortgage servicing portfolio in light of a finding that the business was a corporate opportunity belonging to EMSI and unlawfully diverted to EMI. The Court ruled that, had this business not been transferred to EMI, EMSI's earnings would have increased, resulting in a higher per share valuation at the time of the merger. This finding was based upon the minutes of EPIC's Directors' meetings, which reflected the purpose for which EMSI was created and representations made to Harnett by Billman and McCuistion. Since Harnett testified before the Vice Chancellor concerning those representations while the other principals declined to do so, the findings supporting the diversion of business from EMSI turns, in large part, on matters of credibility. Under our standard of review, we perceive no basis to disturb those findings. *Levitt v. Bouvier*, 287 A.2d at 673.

## IV

■ Cavalier's final claim of error is directed to the Vice Chancellor's refusal to apply a minority discount in valuing Harnett's EMSI stock. Cavalier contends that Harnett's "de minimus" (1.5%) interest in EMSI is one of the "relevant factors" which must be considered under *Weinberger's* expanded valuation standard. In rejecting a minority or marketability discount, the Vice Chancellor concluded that the objective of a section 262 appraisal is "to value the *corporation* itself, as distinguished from a specific fraction of its *shares* as they may exist in the hands of a particular shareholder" [emphasis in origi-

nal]. We believe this to be a valid distinction.

■ A proceeding under Delaware's appraisal statute, 8 *Del.C.* § 262, requires that the Court of Chancery determine the "fair value" of the dissenting stockholders' shares. The fairness concept has been said to implicate two considerations: fair dealing and fair price. *Weinberger v. UOP, Inc.*, 457 A.2d at 711. Since the fairness of the merger process is not in dispute, the Court of Chancery's task here was to value what has been taken from the shareholder: "viz. his proportionate interest in a going concern." *Tri–Continental Corp. v. Battye*, Del.Supr., 74 A.2d 71, 72 (1950). To this end the company must be first valued as an operating entity by application of traditional value factors, weighted as required, but without regard to post-merger events or other possible business combinations. *See Bell v. Kirby Lumber Corp.*, Del.Supr., 413 A.2d 137 (1980). The dissenting shareholder's proportionate interest is determined only after the company as an entity has been valued. In that determination the Court of Chancery is not required to apply further weighting factors at the shareholder level, such as discounts to minority shares for asserted lack of marketability.

Cavalier contends that this Court recognized the appropriateness of discounting a dissenting shareholder's interest in an appraisal proceeding in *Tri–Continental Corp. v. Battye*, 74 A.2d 71. We believe, however, that the *Tri–Continental* decision exemplifies the distinction between applying the discount at the company level against all assets and its use to further devalue a shareholder's proportionate interest.

The company subject to appraisal in *Tri–Continental* was a regulated, closed-end investment company with leverage. *Id.* Because of its closed-end status, the shareholders of the company had no right at any time to demand of the company a proportionate share of the company's assets. This factor, coupled with the company's leverage requirements, resulted in the market value of the stock being historically

lower than its net asset value, the difference being referred to as a "discount." *Id.* at 72–73. Under those specific circumstances, this Court held that a discount had to be applied to the net asset value of the company in order to arrive at the true or intrinsic value of that particular company's stock. *Id.* at 76. However, no discounts were applied at the shareholder level.

The application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a "going concern." Cavalier's argument, that the only way Harnett would have received value for his 1.5% stock interest was to sell his stock, subject to market treatment of its minority status, misperceives the nature of the appraisal remedy. Where there is no objective market data available, the appraisal process is not intended to reconstruct a *pro forma* sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred. Discounting individual share holdings injects into the appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings. More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.

## V

Harnett has cross-appealed from two rulings of the Vice Chancellor concerning the value of his EMSI shares. He argues that it was error to reject the terminal value projections of Harnett's expert witness. He also disputes the Court of Chancery's refusal to reconstruct his share holdings by invalidating the earlier issuance of certain additional EMSI shares to the majority shareholders.

■ As part of his EMSI valuation evidence, Harnett presented the expert testimony of James F. Chadbourne of Price Waterhouse. Chadbourne used a two-step discounted cash flow analysis. He first projected EMSI's net cash flow for a five year period following the merger (1985–1989). He then determined a "residual" or "terminal value" for the company as of the end of that period by opining what a public offering for EMSI through an underwriting would yield at that time. He calculated the offering price to be twelve times the projected 1989 earnings or $110 million. In order to arrive at a merger date valuation, Chadbourne discounted back his terminal value and his projected net cash flow for the five year period.

The Vice Chancellor faulted Chadbourne's approach in two respects. Since terminal value, based on cash flow, is intended to represent the future value of an enterprise at the end of a specified period, it is essential that cash flows be stabilized as of the terminal date. Based on the evidence presented, the court was not satisfied that such stabilization had been established. Second, the court found that Chadbourne "offered no persuasive rationale" for his selection of 1989 as the base year for capitalizing projected earnings. The court was particularly concerned that the selection of 1989, the last and highest year of the projected period, served to inflate the terminal value figure almost three times more than the lowest base year of the period and significantly beyond the value resulting from a five year averaging. When viewed in relation to all other valuations tendered, Chadbourne's $110 million figure appeared to the Court of Chancery to yield an arbitrary result.

Harnett claims that the Vice Chancellor's rejection of Chadbourne's terminal value projection lacks a rational basis in view of the court's acceptance of that methodology in the ERSI appraisal, which is not on appeal. The Vice Chancellor, however, found the evidence supporting the period end cash flow projection "far more persuasive in the case of ERSI" and noted that ERSI's own expert used the same valuation approach, thus lending corroborative validation.

Although he rejected Chadbourne's terminal value projections as unreliable, the

Vice Chancellor made his own determination of value through a capitalization of historical earnings approach and reached a terminal value in 1990 for EMSI of $43,033,914. We find this independent valuation approach consistent with the Court of Chancery's expanded role as the trier of fact in appraisal proceedings. *See Bell v. Kirby Lumber Corp.*, 413 A.2d at 151 (Quillen, J., concurring). In the final analysis, Harnett's argument is directed against the Court of Chancery's weighing of the evidence offered by his expert. The court did not reject the methodology, but merely its lack of a reliable factual premise. A factual finding based on a weighing of expert opinion may be overturned only if arbitrary or lacking any evidential support. *Cf. Barks v. Herzberg*, Del.Supr., 206 A.2d 507, 509 (1965) (trial judge specifically made finding of fact based on credible evidence, which destroyed hypothesis upon which plaintiff built case, thus not requiring Court to consider legal effect of other expert testimony). We find no basis in this record for such a result.

 Harnett's remaining claim of error also involves the *res judicata* effect of the parties' prior litigation. Among the allegations in *Harnett I* was the claim that in June, 1982, Billman and McCuistion had secured from other minority shareholders an assignment of an option to purchase 29,000 shares of EPIC common stock, thereby diluting Harnett's proportionate interest in the entities thereafter spun off from EPIC. In the Court of Chancery, Harnett argued that his share dilution claim, like the corporate opportunity claim, was saved for later assertion in the appraisal proceeding by the terms of the stipulation of dismissal of *Harnett I*. The Vice Chancellor ruled, however, that the share dilution did not survive the demand of *Harnett I* because, it did not "affect the value" of Harnett's stock for appraisal purposes and, in any event, a dispute over the amount of shares held by a dissident shareholder was outside the scope of a statutory appraisal proceeding.

The Court of Chancery correctly ruled that the question of entitlement to a specific number of shares is alien to an appraisal action under Delaware law. Even under *Weinberger's* expanded valuation remedy, the focus continues to be on the determination of the intrinsic worth of the merged corporation, not on the distribution of shares among shareholders. Harnett tacitly concedes that his appraisal remedy here is limited to the fair price component since he alleges no wrongdoing in the merger process itself. As *Weinberger* teaches, fair price means value "per share", *Weinberger v. UOP Inc.*, 457 A.2d at 713, and as was made clear in *Tri–Continental*, the proportionate interest subject to valuation is the dissenting shareholder's "stock which has been taken by the merger" *Tri–Continental Corp. v. Battye*, 74 A.2d at 72. To require the Court of Chancery to conduct a preliminary reallocating of shares based on intra-shareholder disputes, such as dilution claims, would inject into the proceeding a nonvaluation task incompatible with the appraisal purpose. Moreover, we view Harnett's attempt to inject the share dilution claim into the appraisal proceeding as clearly inconsistent with his position on the denial of a minority or marketability discount. If the rationale for rejection of the minority discount is that the valuation focus is limited to the company level and does not involve the size of a particular shareholder's interest, any attempt to reallocate holdings among shareholders is equally irrelevant to the appraisal process.

\* \* \*

The judgment of the Court of Chancery is affirmed in all respects.