[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff Edward Devivo proceeded under Connecticut General Statute § 33-896[1] to dissolve Dattco, Inc. on the grounds that pursuant to § 33-896(a)(1)(A), his brother Louis Devivo, a 50% stock holder, acted in an oppressive manner, and, pursuant to § 33-896(b)(2)(A), the directors are deadlocked in the management of the corporate affairs.
The defendants Dattco, Inc. and Louis Devivo elected to purchase the stock of Edward Devivo at fair value pursuant to § 33-900(a)[2] and the parties not agreeing on that value, the case is now before this court to determine the fair value of Edward's stock, pursuant to § 33-900(d).
The primary issue is the meaning to be attributed to "fair value," as used in § 33-900. Oddly, except for a cursory phrase in Welsh v.Independent Bank Trust Co., 1 Conn. App. 14, 17 (1983), and a determination of fair value based on a stockholders agreement in Stonev. R.E.A.L. Health, P.C., No. CV 98-414972, Judicial District of New Haven (Munro, J., November 15, 2000), no Connecticut cases have construed "fair value", as used in Section 33-900, or in the comparable stockholder dissenters' rights statute, Section 33-855 et. seq., particularly Section33-871.[3]
The facts in this case are as follows:
Dattco is a motor transportation corporation offering the following services: school and charter services to municipalities; transit and paratransit (special use vehicles) services; transportation management services; sales of new and used vehicles and maintenance of vehicle fleets; and tour and travel services.
The corporation was formed by two brothers, plaintiff Edward Devivo and the defendant Louis Devivo. Each owns 50% of the issued and outstanding CT Page 6387 stock of the corporation and both compose the entire board of directors. Edward is secretary treasurer and Louis is president. Edward has generally been in charge of maintenance of the company's vehicles at the company garage; Louis has run the main business of the corporation. Edward and Louis receive the same salary as officers.
The brothers, their wives and sons entered into a stock purchase agreement, as of November 14, 1989. It sought to impose certain restrictions upon the transfer of the corporate stock. The agreement defined "transfer" as:
 "any voluntary or involuntary act by which a stockholder makes, (or a third party, acting for or on behalf of the stockholder, or otherwise by authority under the law) or attempts to make any . . . disposition of any of his shares of stock."
The agreement set the price for the stock as follows:
 "c. Fair market value per share. Price that would be agreed upon between a hypothetical, willing buyer or a hypothetical willing seller for a share of stock, neither party being under any compulsion to buy or sell and both having reasonable knowledge of all the relevant facts except that no discount shall be taken to reflect the lack of marketability of shares of stock or to reflect that a minority (or a majority) interest is being transferred.
That paragraph further provided that if the parties were unable to agree upon the value of the shares it would be determined by the appraisal of three qualified independent appraisers. The agreement also provided that the purchase price was to be paid twenty percent in cash, the balance over a period of ten years, in equal annual principal installments, plus interest at two percent above prime.
At one point after that agreement was entered into, Edward's son Tom and Louis's son Donald came into the company. Tom did not last, but Donald, a lawyer, took over more and more responsibilities, including negotiating contracts with school districts. Louis unilaterally set Donald's salary and annual bonuses without discussion with Edward. Louis started to make all of the company decisions and froze Edward out of participation in setting company policies. The brothers had regularly discussed company policy but after Donald assumed responsibilities, their relationship deteriorated and even led to a physical altercation. Edward, feeling ousted from the decision-making properly attributable to CT Page 6388 his 50% interest, brought suit pursuant to Section 33-386, alleging oppressive conduct by Louis and corporate deadlock, and sought dissolution of the corporation. Dattco elected to purchase Edward's share at fair value, and, if the corporation's election was ineffective, Louis elected to purchase Edward's share.
Edward moved to set aside the election. Judge Robert Hale of this court denied the motion and stayed further proceedings until the appraisal process could take place. This court heard testimony at the trial by plaintiff's appraiser Stanley Matuszurski that Edward's 50% stock interest in Dattco, Inc., as of the valuation date of June 18, 1998, was worth $15,900,000; by plaintiff's appraiser Peter L. Becket that it was worth $16,000,000; and by defendant's appraiser Joseph Floyd that it was worth approximately $4,000,000.
The court must now, pursuant to § 33-900(d), determine the fair value of Edward's share. After making that determination, the court will hear the parties further on the terms and conditions of the purchase, pursuant to § 33-900(e).
Construing §§ 33-896 and 33-900 together, it is clear that the court appraisal function under § 33-900(d) is invoked when a plaintiff initiates a petition to dissolve a closely held corporation on the grounds of directors oppressive conduct, (§ 33-896(a)(1)), or directors deadlock (§ 33-896(b)(2)(A)), and the corporation elects, or if it fails to elect, one or more shareholders elect to purchase the shares of the petitioner at fair value. § 33-900(a). That the petitioner does not have to prove directors oppressive conduct or deadlock at the appraisal trial can be inferred from § 33-897(d), which provides that within ten days after commencement of the dissolution proceeding, the corporation must notify all shareholders of the right to elect to purchase petitioner's shares under § 33-900, and from §33-900(d) which provides if the parties cannot agree on fair value, the court, on application of any party, shall stay the proceeding under § 33-896(a)(1) or (b)(2)(A) and determine the fair value of petitioner's shares. Defendant Louis did apply for a stay in this case and it was granted by Judge Robert Hale. In Stone v. R.E.A.L. Health, P.C., supra, the court determined the fair value of petitioner's shares even after finding the other shareholders did not act in an oppressive manner toward petitioner.
Although court need not at this time make a finding on the merits of plaintiff's claims of director oppressive conduct and deadlock, the court heard evidence on the issues and does find deadlock by the two 50% shareholders in the management of the corporation. Oppression in the context of a dissolution suit suggests "a lack of probity and fair CT Page 6389 dealing in the affairs of a company to the prejudice of some of its members, or a visible departure from the standards of fair dealing and a violation of fair play as to which every shareholder who entrusts his money to a company is entitled to rely." Churchman v. Kehr, 836 S.W.2d 473,482 (Mo.App.S.D., 1992). Under New York law, oppressive conduct sufficient to trigger a corporate dissolution arises when the controlling directors' conduct "substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner's decision to join the firm." Matter of Kemp Beatly,Inc., 473 N.E.2d 1173, 1179 (N.Y. 1984).
In McCauley v. Tom McCauley Son, Inc., 724 P.2d 232 (N.M.App. 1986), the New Mexico court found oppressive conduct by controlling shareholders, under a statute similar to our § 33-896, when the petitioning shareholder was denied a voice in the decision-making processes of the corporation and her reasonable expectations to continue to participate in management of the corporation were thwarted.
Here, the evidence was that Louis, although only a 50% shareholder, has taken over complete management of Dattco, Inc., installed his son as a vice president and given him a substantial salary and bonuses without calling a director meeting, has ceased to confer with Edward on corporate policy matters, and virtually excluded Edward from participation in corporate affairs. Such conduct this court concludes, constitutes acting in an oppressive manner within the meaning of § 33-896(a)(1).
The court first turns to the meaning of "fair value" as used in §33-900. In tax assessment cases, where the issue is the value of real or personal property, various wordings of the statutes on value are given the same meaning. As stated in Bridgeport v. Stratford, 153 Conn. 333, 335
(1966), "The terms actual valuation, actual value, market value, fair market value, market price and fair value are synonymous in the determination of the valuation of property for assessment purposes, but the term "fair value' is the preferable one." See also Sibley v.Middlefield, 143 Conn. 100, 106 (1956). Carol Management Corp. v. Boardof Tax Review, 228 Conn. 23, 34 (1993).
In condemnation cases fair market value is construed as meaning what "would result from fair negotiations between a willing seller and a willing buyer contemplating the highest and best possible use of the land, giving a prudent investor the greatest financial return." D'Addariov. Comm'r of Transportation, 180 Conn. 355, 365 (1980).
Welsh v. Independent Bank Trust Co., 1 Conn. App. 14 (1983) is the only Connecticut case construing "fair value" under § 33-374 (the predecessor to the present § 33-871) where a shareholder dissented CT Page 6390 from a bank merger and sought judicial determination of the fair value of his stock. The trial court based its conclusion on actual sales of the stock as recorded on the bank's stock transfer book listing prices per share. The Appellate Court affirmed, stating the trial judge "may select a legally recognized measure of value (market value) in order to determine the fair value of shares of stock in accordance with the statute as provided." (1 Conn. App. at 17).
In construing "fair value" as used in § 33-900, the court must consider the purpose of the statute, the legislative history, but puts greatest weight on the words used. In this instance, the' legislature, or the drafters of the model business corporation act, could have employed "fair market value" as the standard if they meant that meaning. The fact they did not is highly significant. This court determines fair value, as used in § 33-900, is not synonymous with fair market value.Balsamides v. Protameen Chemicals, 734 A.2d 721, 733 (N.J. 1999);Columbia Management Co. v. Wyss, 765 P.2d 207, 214 (Or.App. 1988)
Coming to a conclusion as to the fair value of the shares a stockholder owns in a closely held corporation requires resolving two separate but overlapping issues: (1) Whether to determine the value of the shares directly without regard for the value of the corporation as a whole, or whether to determine the value of the corporation as a whole and allocate value to the shares in proposition to the percentage interest they represent in the corporation; and (2) whether or not to discount the value of shares of a closely held corporation by reason of their lack of marketability, lack of control or for any other reason. Resolution of these issues are matters of law to be decided by the court, not matters of opinion to be opined by appraisers. Balsamides v. ProtameenChemicals, supra, at 736.
As to the first issue, the majority of the courts, in determining fair value of the stock of a shareholder who petitions for dissolution of a corporation and the corporation or other shareholders elect to buy the petitioner's stock, hold the proper approach is first to determine the value of the corporation as a going concern and then award the petitioner his pro rata share of that value. Advanced Communication Design v.Follett, 615 N.W.2d 285 (Minn. 2000) involved the court construing fair value under a Minnesota statute almost identical with our § 33-900. The court held, at p. 590:
 "We first address the meaning of "fair value' in the Minnesota Corporation Act. Other courts interpreting the term in states' corporation acts have held that fair value is a shareholder's pro rata share of the value of the corporation as a going concern . . . The CT Page 6391 American Law Institute (A.L.I.) has similarly recommended that fair value should equal the shareholders' proportionate interest in the corporation. See A.L.I., Principles of Corporate Governance: Analysis and Recommendations, § 722(a) (1994). We conclude that fair value, in ordering a buy-out under the Minnesota Business Corporation Act, means the pro rata share of the value of the corporation as a going concern. To determine fair value, the trial court may rely on proof of value by any technique generally accepted in the relevant financial community and should consider all relevant factors, but the value must be fair and equitable to all parties."
Applying similar statutes in New Jersey and California, courts of those states have approved determination of the fair value of a petitioner's shares on the basis of his pro rata portion of the value of the closely held corporation as a whole. Balsamides v. Protameen Chemicals, supra;Brown v. Allied Corrugated Box Co., 154 Cal.Rptr. 170 (1979). Charlandv. Country View Golf Club, Inc., 588 A.2d 609 (R.I. 1991). In Brown, at p. 170, the court said, "Rather, the statutes suggest that a minority shareholder who brings an action for the involuntary dissolution of a corporation should not by virtue of the controlling shareholder's invocation of the buy-out remedy, receive less than he would had the dissolution been allowed to proceed."
Under the dissenters' rights statute, § 33-855, et. seq. and its counterpart under the Model Business Corporation Act, § 14-34(a), a shareholder, dissenting from a corporate merger, share exchange, sale of all corporate property, or an amendment to a certificate of incorporation that materially and adversely affects the rights in respect of the dissenters' shares, is entitled to the fair value of his shares. The courts and authorities have recognized that "there is no reason to believe that "fair value' means something different when addressing dissenting shareholders that it does in the context of oppressed shareholders." Balsamides v. Protameen Chemicals, supra at p. 733. See also Robblee v. Robblee, 841 P.2d 1289, 1294 (1992); Wertheimer, Barry M., "The Shareholders' Appraisal Remedy and How Courts Determine Fair Value," 47 Duke L.J. 613, f.n. 138 (Feb. 1998).
In the leading case Cavalier Oil Corp. v. Harnett, 564 A.2d 1137, (Del. 1989), where the court had to determine the "fair value" of a dissenting stockholder's shares representing a 1.5% interest in a corporation, it held, "To that end the company must be first valued as an operating entity by application of traditional value factors . . . The CT Page 6392 dissenting shareholder's proportionate interest is determined only after the company as an entity has been valued."
In specifically rejecting an attempt to determine the value of the dissenting shareholder's stock by a hypothetical sale of that stock, without regard for its pro rata portion of the value of the corporation, the court in In re: McLoon Oil Co., 565 A.2d 998, 1005 (Me. 1989) said, "Especially in fixing the appraisal remedy in a closely held corporation, the relevant inquiry is what is the highest price a single buyer would reasonably pay for the whole enterprise, not what a willing buyer and a willing seller would bargain out as the sales price of a dissenting shareholder's share in a hypothetical market transaction." See also Haynsworth, "Valuation of Business Interests." 33 Mercer L.R. 457, 459 (1982).
Also, as stated in A.L.I. Principle of Corporate Governance: Analysisand Recommendations, Part III, (1994) at p. 321. "In focusing on the value of the firm, rather than the value of specific shares, the principle is adopted that the appraisal remedy should award each shareholder a proportionate share of the firm's value."
Thus this court resolves the first issue raised above by concluding that the proper method to determine "fair value" of the shares of a petitioning shareholder under § 33-900 is to ascertain the value of the corporation as a whole and allocate value to the shares of the petitioning shareholder in proportion to the percentage interest they represent in the corporation.
Turning to the second issue of whether or not to discount the value of shares in a closely held corporation by reason of their lack of control, lack of marketability or for any other reason, it is useful to understand the distinction between a minority discount and a marketability discount. A minority discount adjusts for the fact the shares represent a minority interest in the corporation and thus lack control of it. A marketability discount adjusts for lack of liquidity of the shares of a closely held corporation in the open market. Balsamides v. ProtameenChemicals, supra, p. 733.
As for the minority discount, the legislative history of § 33-900, enacted as part of the Connecticut Business Corporation Act, Public Act 94-186, reveals Representative Richard Tulisano, chairman of the House Judiciary Committee, made the following comment on the House floor:
"I also wanted to put on the record that there are in fact commentaries that have been established which help one interpret this act, both at the Connecticut commentary [sic] and there is commentary to the Model Act CT Page 6393 that people should look to for reference and understanding of the intent of the drafters of the legislation. I also ought to be very honest, I have not read all of those, nor do I necessarily agree with all of those commentaries and for whatever that means for legislative purposes, certainly the proponents of the bill would like that to be looked at. It is probably the normal way of interpreting the legislation." (37 H.R. Proc., Pt. 18, 1994 Session, p. 6446).
Representative Tulisano's reference to the commentary of the Model Business Corporation Act leads this court to the comment relating to § 33-900. It states "In cases where there is dissension but no evidence of wrong conduct, "fair value' should be determined with reference to what the petitioner would likely to receive in a voluntary sale of shares to a third party, taking into account his minority status." Conn. Business Corporation Act Sourcebook, p. 257 (Conn. Bar. Ass'n and Conn. Law Reporter, 1997).
This simply is not an accurate statement of the meaning of § 14-34 of Model Business Corporation Act or of its counterparts in state statutes (§ 33-900 in Connecticut), as construed by courts throughout the country. First, as indicated above, courts reject valuing the petitioner's shares on the basis of a hypothetical sale of those shares on the open market and, rather, determine the value of the corporation as a going entity and allocate value to the shares based on their proportionate interest in the corporation. Secondly, minority discounts in the context of both oppressed shareholder action (under § 33-900) and dissenting shareholder action (under § 33-33-871) are almost universally denied.
In Charland v. Country View Golf Club, Inc., 588 A.2d 609 (R.I. 1991) where the Rhode Island Supreme Court had to determine the fair value of the stock of a petitioning minority shareholder who filed for dissolution of the corporation and the corporation elected to purchase his stock under a statute similar to our § 33-900, the court determined the value of the entire corporation and awarded to the plaintiff his 15% of that value without a discount for minority status of the shareholder. It said, at p. 611: "Most courts that have considered this question have agreed that no minority discount should be applied when a corporation elects to buyout the shareholder who petitions for dissolution of the corporation."
Likewise in the two California cases of Arnold v. 4 C's ElectronicPackaging, Inc., 14 Cal.Rptr. 225 (Cal.App. 2 Dist. 1985) and Brown v.Allied Corrugated Box Co., 154 Cal.Rptr. 190 (Cal.App. 2 Distr., 1979), the courts in buyout situations disallowed discounts for lack of control by the petitioning shareholder. CT Page 6394
The court stated in Brown, at p. 176, "The rule justifying the devaluing the shares in a closely held corporation for their lack of control has little validity when the shares are to be purchased by someone who is already in control of the corporation. In such a situation, it can hardly be said that the value of the shares are less to the purchaser because they are noncontrolling."
To the same effect are Columbia Management Co. v. Wyss, 765 P.2d 207,214 (Or.App. 1988); Raskin v. Walter Karl, Inc., 514 N.Y.S.2d 120
(A.D.2d Dept. 1987).
Likewise in dissenting shareholder actions minority discounts are disallowed. Cavalier Oil Corp. v. Harnett, 564 A.2d 1137, 1144 (Del. 1989); Lawson v. Smith, 734 A.2d 738, 748 (N.J. 1999); In re: McLoon OilCo., 565 A.2d 997, 1003 (Me. 1989). See also, Wertheimer, 47 Duke L.J. 613, 642, supra; Murdock, "The Evolution of Effective Remedies for Minority Shareholders and Its Impact Upon Valuation of Minority Shares." 65 Notre Dame L.Rev. 425, 429 (1990).
As for disallowance of marketability discounts, the courts are not in the same accord as in denying minority discounts.
At the outset an important distinction must be made between applying a marketability discount at the corporate level in determining the value of the corporation as a whole, in contrast to applying that discount at the shareholder level after the corporation has been valued. As noted inBalsamides v. Protameen, supra, at 733, "Discounting at the corporate level may be entirely appropriate if it is generally accepted in the financial community in valuing businesses."
In some states applying a marketability discount to the pro rata value of the petitioner's shares is allowed. In the New York case of Raskin v.Walter Karl, Inc., 514 N.Y.S.2d 120 (A.D.2d Dept. 1987) in a buyout proceeding to avoid dissolution, the court approved valuation of a closely held corporation as a whole, but allowed a marketability discount in determining the fair value of its shares. It said, at p. 122 "A discount for lack of marketability accurately reflects the lesser value of shares that cannot be freely traded, whether they be a minority or a majority of the shares, and as such is an appropriate adjustment."
The American Law Institutes, Principle of Corporate Governance, supra, § 7:22(a) recognizes that under "extraordinary circumstances" a marketability discount may be allowed. It notes that extraordinary circumstances could occur if a dissenting shareholder held out to exploit the transaction giving rise to the appraisal in order to direct value to CT Page 6395 himself that could not be made available proportionately to other shareholders. In Advanced Communication Design, Inc. v. Follett,615 N.W.2d 285, 293 (Minn. 2000), extraordinary circumstances were found when the minority shareholder petitioning for corporate dissolution would receive for his stock an amount more than five times the total net worth of the corporation, about seven times its average annual operating cash flow for the preceding five years, and more than eight times its average net income over the same period. The court in that case recommended that, on remand, the trial court consider applying a marketability discount of between 35% and 55% against the petitioning shareholders' shares.
However, absent extraordinary circumstances, the majority of the courts reject marketability discounts in deadlock, or oppressed shareholders actions. Balsamides v. Protameen Chemicals, supra 734. As stated inCharland v. Country View Golf Club, Inc., 588 A.2d 609, 612 (R.I. 1991): "Furthermore we believe that . . . a lack of marketability discount is inappropriate when a corporation elects to buy out a shareholder who has filed for dissolution of a corporation."
See also Wertheimer, 47 Duke L.J. 613, 618, supra, Murdock, 65 Notre Dame L.Rev. 425, 482, supra.
Likewise, in dissenting shareholder actions the majority of the courts disallow marketability discounts at the shareholder level. Cavalier OilCorp. v. Harnett, supra p. 1144; Lawson v. Smith, supra, p. 748; In re:McLoon Oil Co., supra, p. 1003.
The reasons for disallowing both minority and lack of marketability discounts in valuing the petitioning shareholders' share are:
1. Such discounts deny petitioning shareholders the full proportionate value of their shares that they would receive on dissolution. Brown v.Allied Corrugated Box Co., supra at 176; Lawson v. Smith, supra at p. 748;
2. The discounts unfairly enriches the corporation or buying shareholders who may reap a windfall from the appraisal process by cashing out the petitioning shareholders at less than the proportionate value of the latter's shares. Cavalier Oil Corp. v. Harnett, supra, p. 11145; Lawson v. Smith, supra p. 748; Columbia Management v. Wyss, supra, p. 214;
3. The discounts penalize the petitioning shareholders for taking advantage of the protection afforded by the appraisal statute. Lawson v.Smith, supra, p. 748. CT Page 6396
The basis for disallowing discounts for lack of control and of marketability in this case is confirmed in the shareholder agreement signed by Edward and Louis. The Model Business Corporation Act official comment as to § 33-900 states:
 "If the parties have previously entered into a shareholder's agreement that defines or provides a method for determining the fair value of shares to be sold, the court should look to such definition or method unless the court decides it would be unjust or inequitable to do so in light of the facts and circumstances of the particular case." Conn. Business Corporation Act Sourcebook, supra p. 255.
In Stone v. R.E.A.L. Health, P.C., supra, the plaintiff initiated a proceeding to dissolve a corporation, resulting in invocation of Section33-900, and requiring the court to determine the fair value of the departing shareholder's stock. In that case, a shareholder's agreement between the parties provided a method for determination of the fair value of stock of a shareholder either departing the corporation or selling her shares to it. The formula was that the shareholder would be paid "an amount equal to the net book value of the assets contributed to the corporation by the selling stockholder in consideration for his or her stock." In that case the court held at page 11:
 "The court does not find it inequitable or unfair under all of the circumstances to look to the stockholders' agreement for the determination of the fair value of the plaintiff's stock."
In this case the stockholder's agreement provides in the event of "any voluntary or involuntary act by which a stockholder makes, (or a third party, acting for or on behalf of the stockholder or otherwise byauthority under the law) attempts to make, any . . . disposition of his shares of stock" the price shall be the fair market value of the shares "except no discount should be taken to reflect the lack of marketability of shares of stock or to reflect the fact that a minority (or majority) interest is being transferred."
Defendants contend this court cannot "cherry pick" that provision from the agreement in light of other provisions to the effect the price for the selling shareholders' stock will be determined by three appraisers and the price will be paid over ten years.
This court finds the defendant's argument to be specious. In these CT Page 6397 proceedings the court is not enforcing the stockholder agreement, but simply looking to it to determine whether or not, as the commentary to the Model Business Corporation Act suggests, it "defines or provides a method for determining the fair value of the shares to be sold." Conn.Business Corporation Sourcebook, supra, p. 257. Clearly the stockholder agreement does define the method for determining fair value by specifically excluding discounts for "lack of marketability of the shares or to reflect the fact that a minority (or a majority) interest is being transferred." The court finds that these provisions in the stockholder agreement not to be unjust or inequitable. While the court recognizes an agreement must be construed as an integrated whole and individual paragraphs cannot be enforced separately, nevertheless, the court determines the parties agreeing to eliminate discounts for lack of marketability and of control in determining the value of shares in a voluntary or involuntary transfer is to be given some, but not controlling weight.
Thus the court concludes that discounts for lack of control or of marketability should not be allowed in determining fair value within the meaning of § 33-900.
The court now turns to applying these principles of methods of valuation to the evidence adduced at the trial to determine the fair value of Edward's stock under § 33-900.
The defendant's appraiser, Joseph Floyd, through his appraisal report and testimony, concluded Edward's 50% interest in Dattco, as of the valuation date of June 23, 1998, had a fair value of $3,965,000, rounded to $4,000,000. Mr. Floyd is an experienced business appraiser and competent accountant with a reputable accounting firm, Arthur Anderson, LLP, but his analysis is flawed in three particulars:
1. He premised his analysis on the basis that "fair value," as used in § 33-900, is, as he says in his report "synonymous with fair market value." That emphatically is not a proper construction of § 33-900, of analogous statutes in other states, or of § 14.34 of the Model Business Corporation Act. Balsamides v. Protameen Chemicals, supra at p. 733; Columbia Management Co. v. Wyss, supra, at p. 214. In fact, none of the cases cited herein construing a counterpart to § 33-900 ever equate fair value of petitioner's shares with fair market value of those shares. Mr. Floyd's attempt to justify his interpretation by reference to Internal Revenue Code Ruling 59-60, 1959-1, is misplaced because the purpose of determining fair value under § 33-900 and fair market value under the Internal Revenue Code differ, and reliance on the Internal Revenue Code method has been condemned by legal scholars. Murdock, 65 Notre Dame L.Rev., supra, at pp. 479-80. CT Page 6398
2. Mr. Floyd attempted to reach a value for Edward's 50% interest in Dattco without evaluating Dattco as a whole. This approach is contrary to the holdings of a majority of the courts and all the authorities cited above that the proper method for determining fair value of a petitioner shareholder's shares under statues similar to § 33-900 is to arrive at a value of the corporation as a going concern and to award the petitioner his pro rata portion of that value.
3. Mr. Floyd, after attempting directly to determine the value of Edward's 50% interest in Dattco, further diminishes the value of Edward's shares by lack of control, lack of marketability, and keyman discounts. Discounts for lack of control and of marketability, at the shareholder level, are disallowed in the majority of cases cited above and in this case are further contrary to the shareholder's agreement. As for the keyman discount, Floyd justified it with respect to Louis and his son, Donald, on the ground they did not have a non-compete contract with Dattco. Mr. Beckett, one of plaintiff's appraisers testified Donald was not so important as to justify a keyman discount for him and the court believes his testimony on this point. The same reasons that justify disallowing minority discounts when a corporation or controlling shareholder purchase the shares of the petitioner apply to disallowing keyman discounts. In that situation the significance of the keyman is minimal. Moreover, if Dattco or Louis purchase the stock of Edward, a non-compete agreement can be easily reached for both Louis and Donald so a keyman discount is not warranted.
Because of these flaws in Floyd's appraisal, this court finds it unconvincing and rejects its findings.
Plaintiff's appraisers adopted the correct method of determining the fair value of Edward's shares by appraising Dattco as a whole and allocating to those shares 50% of the value of Dattco without discounts for lack of control, of marketability or keyman.
Plaintiff's first appraiser, Stanley Matuszewski determined the value of Dattco, Inc. by use of the market and transaction approaches. The market approach analyzed and compared Dattco to the operating performances and financial conditions of a selected guideline group of public companies. In that regard, he took into account the following indicators of value: total capitalization to revenues, total capitalization to earnings before interest, taxes, depreciation and amortization (E.B.I.T.A.), total capitalization to earnings before interest and taxes (E.B.I.T.), price to earnings, and price to book equity. He weighted the indicated values from these factors and concluded that based on the market approach, the value of Dattco was CT Page 6399 $30,153,368.00.
Applying the transaction approach, the appraiser researched sales of bus companies in the open market and determined the transaction price as a multiple of revenues. He applied that multiple (.70) to Dattco's revenues for the twelve months ending June 30, 1998 ($47,090,600) and came to a value of $32,963,420.00. He weighted the market approach at 40% and the transaction approach at 60% and came to a conclusion that the value of Dattco was $31,800,000.00. Based on that value, he concluded that Edward's 50% equity interest in the Dattco, as of the valuation date of June 18, 1998, was $15,900.00.
Plaintiff's second appraiser Peter L. Becket also approached the problem of determining the fair value of Edward's shares by first determining the value of Dattco as a going concern. He sought to ascertain the fair market value of Dattco by examining the sales of other bus companies and determining the appropriate multiple to apply to factors such as earnings before interest, taxes, depreciation and amortization (EBITDA), annual revenues, and net tangible assets, and applied those multiples to factors of Dattco. He concluded that an estimated deal price for the sale of Dattco on the open market would be $41,477,591.00. He deducted the long term liabilities of Dattco of $9,556,392 and concluded the final equity value of Dattco was $31,921,199, rounded to $32,000.00. He then determined the fair value of Edward's 50% interest in Dattco was $16,000,000.00.
The court finds Mr. Beckett's analysis to be the most credible. However, an adjustment should be made to his appraisal value. He estimated the deal price for a sale of Dattco to be $41,477,591.00. But he then subtracted only Dattco's long term liabilities of $9,556,392.00 from that figure to arrive at a value of $31,921,199.00. It seems appropriate to this court, that Dattco's entire debt of $14,240,000.00 be subtracted from that estimated deal price. That brings Beckett's value of Dattco to $27,237,591.00, and the value of Edward's 50% interest in Dattco to $13,618,781.00.
This value, however, is 1.6 times Dattco's net worth of $8,377,437 as of December 31, 1999; more than 2.76 times is operating cash flow of $4,928,834 for the year 1999, and more than seven times its net income of $1,842,346 for that year. The Minnesota court in Advanced CommunicationDesign v. Follett, supra, at p. 293, when faced with a similar ratio between the value of a one-third interest in the corporation, arrived at by the principle applied in this case, and the net worth and earnings of the corporation, concluded such a value would "represent an unfair wealth transfer from the remaining shareholders to respondent because it places unrealistic financial demands on the corporation . . . and in all CT Page 6400 probability strips [it] of necessary cash flow and earnings for future growth."
That would be the situation in this case, particularly because of Dattco's large debt, due to the necessity of repeatedly buying new equipment demanded by the schools it services, and because, as the evidence revealed, competition, particularly in the school bus business, has intensified and Dattco cannot be expected to grow at the rate it did before June, 1998.
The Minnesota court found such a situation to be "extraordinary circumstances," requiring the allowance of a marketability discount of between 55% and 35% to achieve a fair value for the petitioning shareholder's shares.
This court adopts that reasoning and applies here a 35% marketability discount to Beckett's $13,618,781 value of Edward's shares. This results in a discount of $4,766,573 and in Edward's share having a value of $9,852,208. The court finds $9,852,208 represents the fair value of Edward's shares, within the meaning of § 33-900.
Although the court found as dicta that Louis' exclusion of Edward from management of Dattco amounted to oppressive conduct, within the meaning of § 33-896(a)(1), and although the comment to the Model Business Corporation Act permits additional compensation for such conduct, Conn.Business Corporation Act Sourcebook, supra, at p. 257, the court declines to award such additional compensation to Edward.
Having determined the fair value of Edward's shares at $9,852,208, the court will now proceed to a hearing on the terms and conditions of payment of that price, pursuant to § 33-900(e), and on whether or not Edward is entitled to reasonable fees and expenses of counsel and of experts, pursuant to the same statute.
Robert Satter Judge Trial Referee