# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE APPRAISAL OF AOL INC.   〉 C.A. No. 11204-VCG

## MEMORANDUM OPINION

Date Submitted: January 17, 2018
Date Decided: February 23, 2018

Stuart M. Grant, Mary S. Thomas, and Laina M. Herbert, of GRANT & EISENHOFER P.A., Wilmington, Delaware, *Attorneys for Petitioners*.

Kevin R. Shannon, Berton W. Ashman, Jr., and Christopher N. Kelly, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: William Savitt, Ryan A. McLeod, Andrew J.H. Cheung, Nicholas Walter, and Courtney L. Shike, of WACHTELL, LIPTON, ROSEN & KATZ, New York, New York, *Attorneys for Respondent*.

GLASSCOCK, Vice Chancellor

Each block of marble, Michelangelo believed (or purported to believe) contained a sculpture; the sculptor's job was merely to pitch the overburden to reveal the beauty within. Early jurists believed (or purported to believe) something similar about common law; that it existed in perfect form, awaiting "finding" by the judge.[1] By contrast, even Blackstone would expect that statutory law would be an explicit, if blunt, tool of justice; manufactured, rather than revealed. Our appraisal statute, Section 262 of the DGCL,[2] is an exception. Broth of many cooks and opaque of intent, it provides every opportunity for judicial sculpting.[3]

The latest pitching of stone from the underlying statutory body occurred in our Supreme Court's recent decisions in *DFC* and *Dell*.[4] Those cases, in distilled form, provide that the statute requires that, where a petitioner is entitled to a determination of the fair value of her stock, the trial judge must consider "all relevant factors,"[5] and that no presumption in favor of transaction price obtains. Where, however, transaction price represents an unhindered, informed, and competitive market valuation, the trial judge must give particular and serious consideration to

---

[1] *E.g.*, 1 William Blackstone, *Commentaries*, *38–62.
[2] 8 *Del. C.* § 262.
[3] *See Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, 2017 WL 6375829, at *13 (Del. Dec. 14, 2017) (noting that although the appraisal remedy is "entirely a creature of statute," statutory fair value has become a "jurisprudential, rather than purely economic, construct.").
[4] *DFC Global Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346 (Del. 2017); *Dell*, 2017 WL 6375829.
[5] 8 *Del. C.* § 262(h).

1

transaction price as evidence of fair value. Where information necessary for participants in the market to make a bid is widely disseminated, and where the terms of the transaction are not structurally prohibitive or unduly limiting to such market participation, the trial court in its determination of fair value must take into consideration the transaction price as set by the market. I will refer to transactions compliant with such conditions by the shorthand "*Dell* Compliant." In sum, while no presumption in favor of transaction price obtains, a transaction that demonstrates an unhindered, informed, and competitive market value is at least first among equals of valuation methodologies in deciding fair value. Where a transaction price is used to determine fair value, synergies transferred to the sellers must be deducted, to the extent they represent "element[s] of value arising from the . . . merger" itself.[6]

This matter is before me seeking a post-trial finding of the fair value of AOL Inc. ("Respondent," the "Company," or "AOL") under the appraisal statute. Because the seminal cases referenced above issued during the pendency of this matter, I asked the parties to supplement the briefing to reference the instruction that *DFC* and *Dell* supply. I note that, throughout that helpful briefing, both the Respondent and Petitioners continue to advocate for my reliance on financial metrics rather than transaction price.[7] Applying the *Dell* criteria of information distribution

---

[6] 8 *Del. C.* § 262(h).

[7] The Respondent, however, argues strenuously that the transaction was *Dell* Compliant, and that I should accept their expert's DCF valuation as consistent with the "ceiling" of deal price, from

2

and barriers to entry with respect to market participation in evaluating whether the transaction here is *Dell* Compliant, I find the matter a close question. AOL was widely known to be in play, the Company talked to numerous potential purchasers in relation to the sale of part (or all) of AOL, the no-shop period running post-agreement was not protected by a prohibitive break-up fee, and the actions of the AOL unaffiliated directors appear compliant with their fiduciary duties. No topping offer emerged. Nonetheless, the merger agreement was protected by a no-shop and matching right provisions. Moreover, the statements made by AOL's CEO, who negotiated the deal, in my view signaled to potential market participants that the deal was "done," and that they need not bother making an offer.

Market participants at this level are not shrinking violets, nor are they barnacles that are happy players during a favorable tide, but shut tight at its ebb. Nonetheless, I find the unusually preclusive statements by the CEO, in light of the other attributes of this transaction, such that I cannot be assured that a less restrictive environment was unlikely to have resulted in a higher price for AOL. Accordingly, I am unable to ascribe fair value solely to market price.

Having rejected transaction price as the sole determinant of value, I find myself further unable, in a principled way, to assign it *any* weight as a portion of my

which the DCF excludes synergy value. Resp't's Br. Addressing the Supreme Court's Decision in *Dell*. 1, 6.

fair value determination. It is difficult, in other words, to ascribe to a non-*Dell*-Compliant sales price (on non-arbitrary grounds) 25%, or 75%, or any particular weight in a fair value determination. Therefore, I take the parties' suggestion to ascribe full weight to a discounted cash flow analysis. I relegate transaction price to a role as a check on that DCF valuation: any such valuation significantly departing from even the problematic deal price here should cause me to closely revisit my assumptions.

After consideration of the experts' reports provided by the parties, and after addressing the differences between the parties in the proper construction of a DCF valuation, in light of the evidence at trial, I find that the fair value of AOL stock at the time of the merger was $48.70 per share. This is my post-trial decision on fair value; my reasoning follows.

## I. BACKGROUND

*A. The Company*

AOL was a well-known[8] global media technology company with a range of digital brands, services, and products that it provided to advertisers, consumers, subscribers, and publishers.[9] AOL underwent significant changes in both perception and fortune after its apex in 2002, when it had more than twenty-six million

---

[8] Famous among users of a certain age as a provider of email access, as announced by the grammatically questionable "You've Got Mail."

[9] Stipulated Joint Pre-Trial Order ¶ 96.

subscribers in the United States and $9 billion in revenues.[10]  AOL spun off as a public company from parent Time Warner in 2009, with Tim Armstrong named as Chairman and CEO.[11]  After the spin-off, AOL shrank, ultimately to five million subscribers.[12]  AOL faced substantial competition by 2014 and found itself in need of extensive consumer data to shift its desired focus to the online advertising industry.[13]  In order to compete, AOL purchased a number of "content" and "ad-tech" companies, such as the Huffington Post, TechCrunch, Thing Labs, Inc., Adapt.tv, and Vidible.[14]  These and other purchases allowed AOL to reposition itself as an ad tech company.[15]

---

[10] JX26 (AOL 10-K ending December 31, 2002) at F-13, F-16.

[11] JX66 (AOL 10-K ending December 31, 2010) at 2, 15.

[12] *Id.* at 46.

[13] JX750 at 4 (quoting Armstrong message in January 29, 2015 board agenda that "[w]hile I believe our overall strategic value as a company will continue to increase, the Wall Street view of the company will be neutral to negative unless one of our products becomes a catalyst for increased growth in 2015."); JX 1817 (quoting Armstrong in a March 26, 2015 email expressing concern about AOL's ability to obtain the required data and content to compete); JX 1079 (referring to a March 15, 2015 Armstrong email to the AOL Board about the lack of data and potential ways to address it, including a possible auction of the company); *but see* JX972 (quoting Armstrong email of February 28, 2015 to the AOL Board where Armstrong states that "[o]ur strategy and direction is dead on with the market and we have built a company that is strong and capable").

[14] JX2901 (describing AOL's acquisition of the Huffington Post on AOL's Form 8-K filed February 6, 2011); JX0066 at 85–86 (containing AOL's Form 10-K filed on December 31, 2010); JX0199 at 80–82 (containing AOL's Form 10-K filed on December 31, 2013); JX0968 at 2, 85–87, 90 (containing AOL's Form 10-K filed on December 31, 2014).

[15] JX2196 (Verizon CEO McAdam) at 105:22–24 ("Q. Was AOL discussed as one of the few players that had scale and advertising technology?  A. Yes."), 106:11–15 ("One of those markets was mobile advertising. And to deliver—to participate in that market and to build capability, AOL was one of the opportunities we saw to enter the market quickly and to have a reasonable starting point."); Trial Tr. 333:13–19 (Marni Walden, head of Verizon's Product Innovation and New Businesses division, spoke with Armstrong about Verizon's interest in AOL's "ad tech capabilities").

AOL organized itself into three segments: Membership, Brands, and Platforms.[16] The Membership Group included the legacy dial-up internet and search services.[17] The Brands Group included the Huffington Post, TechCrunch, MapQuest, and other content providers.[18] The Platforms Group provided automated online advertising services for advertisers and publishers across multiple device and media formats.[19] As with other companies of similar size, AOL was closely followed by numerous analysts.[20]

*B. Initial Discussions and Negotiation*

Similar to other boards of directors, the AOL board of directions (the "AOL Board" or the "Board") "regularly review[ed] and assess[ed] the Company's business strategies and objectives," in order to "enhanc[e] stockholder value."[21] The AOL Board frequently considered many types of transactions and partnerships with other companies.[22] "In addition, the Company and its representatives [were] routinely approached by other companies and their representatives regarding possible transactions."[23] Several of those included inquiries from Silver Lake,[24]

---

[16] JX1180 at 3.
[17] JX0968 (AOL 10K filed on December 31, 2014) at 8.
[18] *Id.* at 8.
[19] JX1180 at 4.
[20] *See, e.g.*, JX1803 (examining JMP Securities, *Our Thoughts on Verizon's $50 per share Offer for AOL: Maintain Market Perform Rating*, May 12, 2015).
[21] JX1851 (the "Solicitation" or "AOL Schedule 14D-9") at 16.
[22] *Id.*
[23] *Id.*
[24] JX1180 at 4.

Tomorrow Focus,[25] Axel Springer,[26] Providence Equity,[27] and Hellman & Friedman.[28]

In June 2014, at the request of Verizon Communications Inc. ("Verizon"), AOL CEO Armstrong and Verizon CEO Lowell McAdam "discussed ongoing and emerging trends in their respective industries" at a media finance conference.[29] In October 2014, Verizon management contacted AOL to propose an initial meeting regarding "potential partnership opportunities" and the two CEOs met again that November.[30] A Verizon subsidiary and AOL entered into a confidentiality agreement in late November.[31]

In early December, representatives of AOL and Verizon met over three days to discuss "several potential collaborative opportunities," although McAdam informed Armstrong that "Verizon had no interest in the acquisition of the entire Company or of a majority interest in the Company."[32] In addition, AOL held a preliminary discussion with Comcast, a global telecommunications conglomerate, "regarding a potential transaction involving all or part of AOL's businesses" on

---

[25] JX140.
[26] JX0155.
[27] JX293.
[28] JX0155.
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.* at 16–17.

December 9, 2014.[33]  McAdam and Armstrong spoke again by phone in mid-December 2014 and met in mid-January 2015 to "explore a joint venture."[34]

AOL management discussed a potential Verizon transaction with the AOL Board during their January 2015 meeting.[35]  In January 2015, rumors about a potential transaction involving AOL leaked and caused AOL's stock price to rise.[36]

In February 2015, Verizon presented AOL with a high-level term sheet for a potential joint venture and the parties met several times to discuss it that February and March and continue with due diligence.[37]  Verizon was not the only suitor for a deal with AOL.  An AOL executive emailed Armstrong on February 20, 2015 that:

> Given the [Verizon] news in the press, the [AT&T] President of Advertising has express [sic] a very strong interest in having broader strategic conversation with us. They want a bite at the apple and don't want to be boxed out by [Verizon]. If we are going to move forward here we should engage at the CEO level is my view.[38]

Armstrong responded:

> I know . . . the [AT&T] CEO well - but we should discuss this . . . . We need to be ethical (not suggesting you were suggesting that – and know this is natural with press and BD - but me calling CEO of AT&T feels like a bridge too far).[39]

---

[33] AOL Schedule 14D-9 at 17.
[34] *Id*. at 17.
[35] *Id*.
[36] Stipulated Joint Pre-Trial Order, Ex. A; JX1974 (quoting AOL CEO Armstrong about rumors surrounding AOL).
[37] *Id*. at 18.
[38] JX0902 at 1.
[39] *Id*.

8

Armstrong described his rationale for this answer during trial:

> Q. And why did you say that calling the CEO of AT&T in these circumstances was a bridge too far?
>
> A. Well, I think that from where we were at the time period and knowing what we knew about AT&T and knowing what we knew about Verizon, the risk of having Verizon walk away at this point was much higher than the upside of trying to get AT&T involved when they were clearly outsourcing their core business in our core area to us, overall. So it just did not seem like a smart move.
>
> Q. Why were you concerned that a contact with AT&T might cause Verizon to walk away?
>
> A. I think one is Verizon was upset about the leak. And I think in the situation in a deal negotiation where, you know, we're in negotiations with Verizon, AT&T is not a real candidate, and we go to them, [Verizon CEO and Chairman McAdam], I think, is a very ethical person and somebody that, you know, he would take this the wrong way and we would risk losing the deal.[40]

Armstrong explained during his deposition that the AT&T overture was not "somebody senior at AT&T speaking for AT&T. This [was] somebody at the division that [AT&T was] looking to outsource to us, talking to one of our lower-level [business development] people."[41] In a later explanation to Verizon executive Marni Walden about these discussions with AT&T, Armstrong described these as "advanced discussions to launch a new strategic partnership. At the core of the

---

[40] Trial Tr. 490:1–20 (Armstrong).
[41] *Id.* at 543:16–19.

9

discussions was AT&T's content and service portal, which has been powered for Yahoo for many years."[42]

Fox, a multinational mass media corporation, also contacted AOL to express interest in AOL's platforms and brands businesses on February 26, 2015.[43] Private equity firm General Atlantic contacted AOL in March 2015 "to discuss an acquisition of certain of the Company's assets" and entered into a confidentiality agreement on March 7, 2015.[44] General Atlantic conducted limited preliminary diligence on these assets.[45] Fox entered into a confidentiality agreement with AOL and listened to a presentation by AOL on March 9, 2015.[46]

*C. Sales Process*

On March 25, 2015, Verizon proposed obtaining majority ownership of AOL for the first time.[47] The AOL Board began to meet weekly to "review the deal landscape, including the potential transaction with Verizon."[48]

AOL declined to conduct an auction. Fredric Reynolds, AOL's lead director, explained why AOL did not pursue an auction during his deposition:

> Q: Could you please explain why, in your view or in the view of the board as a whole, you thought it was not desirable for AOL to run an auction?

---

[42] JX1958 at 1 (June 22, 2015 email from Armstrong to Walden).
[43] AOL Schedule 14D-9 at 18.
[44] *Id.*
[45] *Id*.
[46] *Id*.
[47] *Id*.
[48] *Id*. at 19.

A: Again, I think, if I wasn't clear, I think in a business that has to do with technology and content, that it's a very fragile business, and letting the world know that you're for sale impacts your relationship with your -- with your competitors for sure, but also with your partners, be they publishers, being the search companies, being the talent that you want to attract.

Those are all very difficult relationships that I think are almost impossible to be managed if a media company or a technology company is for sale.

I -- I don't recall any large technology or large media company ever putting itself up for sale. I think, as evidenced last week, AT&T buys Time Warner. There was not an auction of that. It's just a very, very -- it's unusual, but technology and media companies don't have hard assets, they don't have long-term contracts that make airplanes or iPhones or anything like that. It's all ephemeral.[49]

Reynolds stated that "the company was not for sale and it was purposeful that it not be for sale"[50] and that the Board did "not auction[] the company. We had had no intention of auctioning the company."[51]

Discussions between AOL and Verizon continued in early April, and McAdam "raised the possibility of a 100% acquisition of the Company with Mr. Armstrong" on April 8, 2015.[52] Comcast entered into a confidentiality agreement with AOL that day, but declined to proceed any further with a transaction.[53]

---

[49] JX2210 (Reynolds Dep.) at 119:8–120:4.
[50] *Id.* at 84:17–18.
[51] *Id*. at 85:5–8.
[52] *Id*.
[53] AOL Schedule 14D-9 at 19.

On April 12, 2015, AOL management discussed the Verizon transaction with the Board, including "the emphasis that [Verizon] . . . put on their ability to retain the Company's management."[54] The Board "requested that Mr. Armstrong keep the Board apprised of these discussions as they progressed" but authorized further discussions with Verizon regarding both the transaction and management retention.[55] AOL opened a data room to Verizon on April 13, 2015.[56]

Verizon's counsel engaged AOL's counsel in a discussion on April 14, 2015 about "the importance to Verizon of retaining the Company's CEO and others on its management team and Verizon's desire to engage in a discussion with Mr. Armstrong regarding such future employment arrangements."[57] AOL's counsel informed Verizon that "Verizon's views had been discussed with the Board and that the Board had authorized Mr. Armstrong to engage in such discussions."[58] McAdam and Armstrong met again on April 17, 2015 to "discuss the potential integration of AOL and its personnel into Verizon's business."[59] During this period, Fox made several diligence calls to AOL, but did not contact AOL for further information.[60]

---

[54] JX1293 at 3.
[55] *Id.*
[56] AOL Schedule 14D-9 at 19.
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.*

Verizon sent a draft merger agreement to AOL on April 22, 2015.[61] The AOL Board met on April 26, 2015 to discuss the draft agreement, the deal landscape, "the possibility of seeking alternative offers," Verizon's "emphasi[s] . . . [on] the retention of the Company's management team," and AOL's continued retention of Allen & Company ("Allen & Co.") as its financial advisor.[62] AOL returned a revised draft merger agreement to Verizon on April 27, 2015 that proposed changes to a number of terms, including termination rights, the non-solicitation provision, antitrust approval, and others.[63] Verizon management spoke with Armstrong on April 30, 2015 about "the importance to Verizon that AOL's talent continue at the Company following the Merger and indicated that employment arrangements would be structured by Verizon to include compensation opportunities tied to the performance of the Company and in aggregate amounts at least comparable to current compensation opportunities."[64] However, "[n]o specific details of such compensation arrangements were discussed."[65]

AOL and Verizon exchanged draft agreements on May 1 and May 3, 2015.[66] The AOL Board discussed these drafts and "the importance that Verizon was placing

---

[61] *Id.* at 20.
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Id.* at 20–21.

on the retention of the Company's management team and Verizon's desire for employment and retention arrangements" on May 3, 2015.[67]

On May 4, 2015, a consortium including, among others, General Atlantic, Axel Spring SE, and Huffington Post CEO and founder Arianna Huffington, submitted a letter to AOL indicating its willingness to purchase a 51% stake in AOL's Huffington Post asset for approximately $500 million.[68]

On a May 7, 2015 phone call, Verizon informed AOL that Verizon "was planning to submit a formal offer to acquire the entire Company."[69] The AOL representative indicated that AOL expected a price per share "in the 50s" but the Verizon representative indicated that it would be "in the high 40s."[70] Verizon also indicated that it would present Armstrong with a specific employment proposal.[71] AOL reported financial results that beat analysts' expectations on May 8, 2015.[72]

On May 8, 2015, a Verizon representative made an oral offer of $47.00 per share for AOL.[73] An AOL representative countered and Verizon agreed to pay $50.00 per share in cash.[74] Verizon stated that "there was no further room for negotiation with respect to the offer price and that if this price was not of interest,

---

[67] *Id.* at 21.
[68] JX1582 at 6.
[69] *Id*.
[70] *Id*.
[71] *Id*.
[72] *Id.*
[73] *Id*.
[74] *Id*.

14

Verizon was prepared to withdraw its offer."[75]  Verizon submitted a written offer at $50 later that day. The AOL Board discussed the offer, and counsel from the two companies negotiated certain terms.[76]

Armstrong phoned a Verizon representative on May 9, 2015 to request a higher price but was told "that there was no further room for negotiation with respect to the offer price," although Verizon agreed to lower the termination fee from 4.5% to 3.5%.[77]  The AOL Board discussed the developments that same day.[78]

The parties exchanged additional draft agreements and Verizon delivered a draft employment letter offer to Armstrong on May 10, 2015.[79]  "Mr. Armstrong had no conversations with Verizon regarding the draft letter prior to the conclusion of the Company's next Board meeting."[80]

On May 11, 2015, the AOL Board discussed the Verizon merger agreement with management and its legal and financial advisors.[81]   The Board then "unanimously voted to approve the Merger Agreement."[82]  Later that day, "Verizon

---

[75] *Id.*
[76] *Id.* at 21–22.
[77] *Id.* at 22; JX1755 at 3 (May 11, 2015 Verizon internal slideshow about the sales process stated that "Verizon did not communicate any flexibility on price, but signaled flexibility on break fee." Verizon submitted an offer of $47 per share but later submitted an offer for $50 per share "after significant verbal negotiations.").
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*

informed Mr. Armstrong that they were unwilling to proceed with a transaction without his agreement to terms" of employment and Armstrong and Verizon came to an agreement.[83]

The Verizon board of directors also approved the merger agreement, which was executed on May 11, 2015 (the "Merger Agreement" or "Agreement").[84] The deal was announced on May 12, 2015.[85] According to Armstrong, "a couple of days after [the] Verizon acquisition was announced, AT&T terminated contract negotiations and asked us to stop all development on product and content based on general sensitivities to competitor concerns, data separation, etc."[86]

In a CNBC television interview on the day the merger was announced, Armstrong gave this account of how the Verizon deal came together:

> Interviewer: Hey, Tim, couple of quick things. Help us with this first. Was there an auction? Give us back story here. Meaning, who went to whom? How did this happen?
>
> Armstrong: You know, basically, this happened in a very natural way and no auction. Basically over the course of time I sat down last summer at the Sun Valley conference and we talked about where the world was going and we have been big partners and we were kind of reviewing what the companies were doing together. That sort of kicked off sort of a natural progression to where we are today and I think facilitated by Nancy of Allen and Company and David Shapiro we were able to basically bring this deal together in a way that I think was

---

[83] *Id.*
[84] *Id.* at 23.
[85] *Id.*
[86] JX1958 at 1 (June 22, 2015 email from Armstrong to Walden).

16

incredibly natural. If you look at the two visions on the companies and the platforms and both companies were doing the same thing.

Interviewer: It's trading slightly above the premium right now. you didn't shop this to anybody else?

Armstrong: No, I'm committed to doing the deal with Verizon and I think that as we chose each other because that's the path we're on. I gave the team at Verizon my word that, you know, [w]e're in a place where this deal is going to happen and we're excited about it.

. . .

Interviewer: Not to push you on it, but why not pursue an auction?

Armstrong: You know, Andrew, I think the process of where we are as a company right now and the process we went through and knew you guys covered, lots of rumors about AOL in general. So, if somebody, we have always been a public company and been available. If somebody wanted to come do a deal with us, they would have done it. The Verizon deal was built around the strategy of where we're going.[87]

*D. Merger and Subsequent Events*

The Merger Agreement contained a no-shop provision, a 3.5% termination fee of $150 million, and unlimited three-day matching rights.[88] Stockholders were informed that the Merger Agreement allowed for the "ability to accept a superior proposal."[89] Verizon was "[p]repared for market action but expect[ed] limited interest from media/technology strategics and financial sponsors" due to its

---

[87] JX1794 at 6.

[88] AOL Schedule 14D-9 at 222, 24–25; Trial Tr. 796:13–20 (Reynolds) ("We were encouraged that there – the deal was drafted in a way that would allow an unfettered bid from a third party and it would enhance our shareholders' value.").

[89] AOL Schedule 14D-9 at 21.

assessment of a "limited interloper risk given [the] current sale status with [a] lack of full company buyers."[90] No topping bidder emerged.[91] More than 60% of AOL's outstanding common shares were tendered and the merger closed on June 23, 2015 (the "Valuation Date").[92]

The Petitioners filed for appraisal rights under Section 262 of the DGCL.[93] Six appraisal petitions were filed, which are consolidated in this action.[94] The parties and experts agree that a DCF analysis is the most appropriate valuation method in this matter.[95] My analysis follows.

## II. WAS THE SALES PROCESS DELL COMPLIANT?

The appraisal remedy was created by statute to allow dissenting stockholders an "independent judicial determination of the fair value of their shares."[96] Because neither party bears the burden of proof, "in reality, the 'burden' falls on the judge to determine fair value, using 'all relevant factors.'"[97] The fair value of those shares is "exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation,"[98] and calculated based on the "operative reality of

---

[90] JX1755 at 14 (including a Verizon internal presentation from May 11, 2015).
[91] Trial Tr. 796:21–22 (Reynolds).
[92] Stipulated Joint Pre-Trial Order ¶¶ 8–9.
[93] 8 *Del. C.* § 262.
[94] Stipulated Joint Pre-Trial Order ¶ 2–3.
[95] Sept. 19, 2017 Oral Arg. Tr. 25:4–8.
[96] *Dell, Inc.*, 2017 WL 6375829, at *12 (citing *Ala. By-Products Corp. v. Cede & Co. ex rel. Shearson Lehman Bros., Inc.*, 657 A.2d 254, 258 (Del. 1995)).
[97] *In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726, at *1 (Del. Ch. Jan. 30, 2015) (citations omitted).
[98] 8 *Del. C.* § 262.

18

the company"[99] as of "the date of the merger."[100]  The court should view the company as a standalone "going concern"[101] or an "on-going enterprise, occupying a particular market position in the light of future prospects."[102]  Because the court values the "corporation itself," a minority discount[103] and "any synergies or other value expected from the merger giving rise to the appraisal proceeding itself must be disregarded."[104]  Accordingly, petitioning stockholders are given their "proportionate interest" of the value of the corporation on the date of the merger, plus interest.[105]

Because each transaction is unique, "[a]ppraisal is, by design, a flexible process."[106]  However, "the clash of contrary, and often antagonistic, expert opinions" with "widely divergent views" is a common feature of the genre.[107]  As further described below, there is "no perfect methodology for arriving at fair value for a given set of facts."[108]

---

[99] *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 525 (Del. 1999).
[100] *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1142 (Del. 1989).
[101] *Id.* at 1145.
[102] *In re Appraisal of Shell Oil Co.*, 607 A.2d 1213, 1218 (Del. 1992).
[103] *Cavalier Oil Corp.*, 564 A.2d at 1144.
[104] *Global GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 507 (Del. Ch. 2010), *aff'd*, 11 A.3d 214 (Del. 2010).
[105] *Cavalier Oil Corp.*, 564 A.2d at 1144.
[106] *Golden Telecom, Inc.*, 11 A.3d at 218.
[107] *In re Appraisal of Shell Oil Co.*, 607 A.2d at 1222.
[108] *Dell, Inc.*, 2017 WL 6375829, at *15 (citing *DFC Global Corp.*, 172 A.3d at 348–49, 351).

The Supreme Court has "reject[ed] requests for the adoption of a presumption that the deal price reflects fair value if certain preconditions are met, such as when the merger is the product of arm's-length negotiation and a robust, non-conflicted market check, and where bidders had full information and few, if any, barriers to bid for the deal."[109]  Indeed, the Supreme Court doubts its ability "to craft, on a general basis, the precise pre-conditions that would be necessary to invoke a presumption of that kind.[110]  That said, the Supreme Court in *DFC* stated:

> Although there is no presumption in favor of the deal price, under the conditions found [in *DFC*] by the Court of Chancery, economic principles suggest that the best evidence of fair value was the deal price, as it resulted from an open process, informed by robust public information, and easy access to deeper, non-public information, in which many parties with an incentive to make a profit had a chance to bid.[111]

*A. The Sales Process Was Not "Dell Compliant"*

The question before me is whether the sales process here is *Dell* Compliant. A transaction is *Dell* Compliant where (i) information was sufficiently disseminated to potential bidders, so that (ii) an informed sale could take place, (iii) without undue impediments imposed by the deal structure itself.  In other words, before I may consider the deal price as persuasive evidence of statutory fair value, I must find that the deal process developed fair *market* value.  I conclude that, under the unique

[109] *Dell, Inc.*, 2017 WL 6375829, at *14 (citing *DFC Global Corp.*, 172 A.3d at 348).
[110] *DFC Global Corp.*, 172 A.3d at 366.
[111] *Id.* at 349.

20

circumstances of this case, the sales process was insufficient to this task, and the deal price is not the best evidence of fair value.

The AOL Board made a deliberate decision that stockholder value would not be maximized through an auction, and instead decided to pursue potential bidders individually by direct contact through bankers and other sources. Given the dynamics of AOL's particular industry, this decision appears reasonable. However, if front-end information sharing is truncated or limited, the post-agreement period should be correspondingly robust, so to ensure that information is sufficiently disseminated that an informed sale can take place and bids can be received without disabling impediments.

Despite statements by AOL's leadership that AOL was not for sale, the persistent market rumors seem to indicate that the market understood that the Company was likely in play. AOL was well-covered by analysts, traded frequently, and generally known in the market. AOL approached, and was approached by, a number of potential buyers of some (or all) of the Company, several of whom entered into confidentiality agreements and conducted due diligence.

AOL appears to have engaged with anyone that indicated a serious interest in doing a deal.[112] On the front end, the market canvas appears sufficient so long as interested parties could submit bids on the back end without disabling impediments.

However, here my concern arises. Immediately after announcement of the transaction, Armstrong gave a public interview and stated:

> I'm committed to doing the deal with Verizon and I think that as we chose each other because that's the path we're on. I gave the team at Verizon my word that, you know, [w]e're in a place where this deal is going to happen and we're excited about it.[113]

Armstrong's post-Agreement statements to the press about giving his "word" to Verizon could reasonably cause potential bidders to pause when combined with the deal protections here. In *Dell*, by comparison, the merger agreement included one-time matching rights until the stockholder vote; a forty-five day go-shop period; and termination fees of approximately 1% of the equity value during the go-shop or approximately 2% afterward.[114] Here, a termination fee of 3.5% and a forty-two day window between agreement and closing would probably not deter bids by themselves. But that period was constrained by a *no-shop* provision, combined with: (i) the declared intent of the acting CEO to consummate a deal with Verizon, (ii) the

---

[112] The Petitioners point to the fact that AT&T's potential approach was rebuffed. However, given the circumstances here, including the record evidence that there was a fear that engaging with AT&T would discourage or endanger the developing deal with Verizon, lack of engagement with AT&T, pre-Agreement, appears reasonable.
[113] JX1794 at 6.
[114] *Dell, Inc.*, 2017 WL 6375829, at *6–7.

CEO's prospect of post-merger employment with Verizon, (iii) unlimited three-day matching rights, and (iv) the fact that Verizon already had ninety days between expressing interest in acquiring the entire company and signing the Merger Agreement, including seventy-one days of data room access. Cumulatively, these factors make for a considerable risk of informational and structural disadvantages dissuading any prospective bidder.

In *Dell*, after the "bankers canvassed the interest of sixty-seven parties, including twenty possible strategic acquirers during the go-shop," the "more likely explanation for the lack of a higher bid [was] that the deal market was already robust and that a topping bid involved a serious risk of overpayment," which "suggest[ed] the price [was] already at a level that [was] fair."[115] Here, given Armstrong's statements and situation, together with significantly less canvassing and stronger post-agreement protections than in *Dell*, I am less confident that is true. I cannot say that, under these conditions, deal price is the "best evidence of fair value . . . as it resulted from an open process, informed by robust public information, and easy access to deeper, non-public information, in which many parties with an incentive to make a profit had a chance to bid."[116]

---

[115] *Dell, Inc.*, 2017 WL 6375829, at *21, 24.
[116] *DFC Global Corp.*, 172 A.3d at 349.

*B. Deal Price as a Check*

"The dependability of a transaction price is only as strong as the process by which it was negotiated."[117]  I find the deal price is not sufficient evidence of fair value to warrant deference, but it is still useful to an extent.  I will use it as a "check" in my determination of fair value, although I decline to give the deal price explicit weight in that determination.  Given the process here, a determination of fair value via financial metrics that results in a valuation grossly deviant from deal price, under these circumstances, should give me reason to revisit my assumptions.  In this way, the deal price operates as a check in my determination of fair value.[118]

The parties have not suggested a principled way to use deal price under the circumstances here, in a blended valuation of deal price and other valuation metrics, and none occurs to me.  Instead, the parties agree, and I concur, that a discounted cash flow analysis is the best way to value the Company.[119]  I turn to that now.

---

[117] *Merlin Partners LP v. AutoInfo, Inc.*, 2015 WL 2069417, at *11 (Del. Ch. Apr. 30, 2015).

[118] AOL stock publicly traded on the New York Stock Exchange.  The unaffected stock price was $42.59, and the merger price was thus at a premium to the unaffected trading price.  As with deal price, an efficiently derived stock trading price can serve as a check on a fair value analysis. Recently, this Court in *Verition Partners Master Fund Ltd. v. Aruba Networks, Inc.*, 2018 WL 922139 (Del. Ch. Feb. 15, 2018), found an efficiently derived trading price to be fair value.  I note that no party has advocated such here, and that no evidence concerning the efficiency of the market for AOL stock is before me.  Moreover, the use of trading price to determine fair value requires a number of assumptions that, to my mind, are best made or rejected after being subject to a forensic and adversarial presentation by interested parties.  Thus, I do not consider stock trading price further.

[119] *See supra* note 7.  Because I do not explicitly give weight to the deal price, I need not address certain related issues, such as the calculation of synergies.

24

## III. FAIR VALUE AND DISCOUNTED CASH FLOW ANALYSIS

*A. Use of Discounted Cash Flow Analysis*

Under 8 *Del. C.* § 262, to determine "fair value," a court must value a corporation as a "going concern" according to the corporation's "operative reality" as of the date of the merger.[120]  Further, a court "must take into consideration all factors and elements which reasonably might enter into the fixing of value," and consider "facts which were known or which could be ascertained as of the date of merger."[121]  The court retains discretion to use "different valuation methodologies" so long as the court justifies that exercise of discretion "in a manner supported by the record before it."[122]  The court must derive the fair value of the shares "exclusive of any element arising from the accomplishment or expectation of the merger."[123]  When using a DCF analysis, "this Court has recognized that management is, as a general proposition, in the best position to know the business and, therefore, prepare projections" in the "ordinary course of business."[124]  With these general principles in mind, I turn to my valuation of AOL.

I rely primarily upon a DCF analysis, as "[b]oth experts agree that the DCF is the best and most reliable way to value AOL as a going concern as of the merger

---

[120] *M.G. Bancorporation, Inc.*, 737 A.2d at 525.
[121] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983) (quoting *Tri-Continental Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950)).
[122] *DFC Global Corp.*, 172 A.3d at 35     1.
[123] 8 *Del. C.* § 262(h).
[124] *In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726, at *18.

25

date."[125]  A DCF analysis, "although complex in practice, is rooted around a simple principle: the value of the company at the time of the merger is simply the sum of its future cash flows discounted back to present value."[126]  Further, a DCF analysis "is only as reliable as the inputs relied upon and the assumptions underlying those inputs."[127]  However, "the use of math should not obscure the necessarily more subjective exercise in judgment that a valuation exercise requires."[128]  I also acknowledge the *Dell* court's recent delineation of the weaknesses of the method:

> Although widely considered the best tool for valuing companies when there is no credible market information and no market check, DCF valuations involve many inputs—all subject to disagreement by well-compensated and highly credentialed experts—and even slight differences in these inputs can produce large valuation gaps.[129]

The Petitioners hired a well-qualified academic, Dr. Bradford Cornell, a visiting professor at the California Institute of Technology, as their expert witness. Cornell performed a financial analysis, and concluded that the fair value of AOL stock was $68.98 per share.[130]  For reasons not necessary to detail, however, the Respondent questioned Dr. Cornell's impartiality in this matter, and the Petitioners seem content to use the DCF model presented by the Respondent's expert as a starting point for my analysis.  Accordingly, I start with the DCF valuation provided

---

[125] Sept. 19, 2017 Oral Arg. Tr. 25:5–8.
[126] *In re of SWS Grp., Inc.*, 2017 WL 2334852, at *11 (Del. Ch. May 30, 2017).
[127] *Id.*
[128] *Agranoff* v. *Miller*, 791 A.2d 880, 896 (Del. Ch. 2001).
[129] *Dell, Inc.*, 2017 WL 6375829, at *28.
[130] Trial Tr. 108:17–21 (Cornell).

26

by that expert, Professor Daniel Fischel, and consider the Petitioners' limited arguments that certain assumption or inputs in that valuation must be changed.

Fischel opined that the fair value of AOL stock was $44.85 per share.[131] The Petitioners' disagreements with the Fischel analysis are limited, although the effects of that disagreement on the calculation of fair value are vast. The parties dispute only four items: (1) the proper cash flow projections for the DCF; (2) the operative reality assumed in the DCF with regard to two deals with Microsoft and one deal with Millennial Media Inc.; (3) the proper projection period and terminal growth rate; and (4) how much of AOL's cash balance must be added back after the DCF. I discuss each in turn.

*B. Disputed Addition and Inputs*

### 1. Cash Flow Projections

"The most important input necessary for performing a proper DCF is           a projection of the subject company's cash flows. Without a reliable estimate of cash flows, a DCF analysis is simply a guess."[132] The parties point to three potential sets of cash flow projections. The projections relied on by Fischel in his analysis, which I use as a starting point, are management's long-term plan for 2015 (the "Management Projections" or the "LTP").[133] Fischel selected these projections

---

[131] Trial Tr. 1065:6–9 (Fischel).
[132] *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 332 (Del. Ch. 2006).
[133] JX0917; JX0921 at 46.

because they were "described as the 'best currently available estimates and judgements of [AOL]'s management as to the future operating and financial performance of [AOL],' and were used by AOL's financial advisor Allen in its May 11, 2015 fairness opinion."[134] The Petitioners encourage me to use either of two other projections relied on by Cornell. The first is based on ten-year projections that AOL submitted to Deloitte for a tax impairment analysis (the "Deloitte Projections").[135] The second, (the "Disputed Projections"), contained substantial differences, compared to the Management Projections, in working capital requirements and was sent by AOL to Verizon's advisors in April 2015. I find that the best estimate of cash flow projections is the Management Projections, made in the regular course of business, for the reasons that follow.

The Management Projections were completed in mid-February 2015 and presented to the AOL Board.[136] The AOL Board created four-year long-term plans as a part of its annual internal budgeting process.[137] AOL executives testified that the LTP did not include costs or risks from specific acquisitions or transactions;[138] however, the LTP assumed that AOL would fill strategic gaps in areas such as

---

[134] JX2255 (Fischel Report) ¶ 41; AOL Schedule 14D-9 at 24.
[135] Trial Tr. 649:19–650:3 (Dykstra).
[136] JX0917; JX0921 at 46.
[137] Trial Tr. 355:17–22 (AOL CFO of Platforms Bellomo), 641:17–642:10 (AOL CFO Dykstra).
[138] *Id.* at 363:10–13 (quoting AOL CFO of Platforms Bellomo's response that the LTP did not "account for the cost of acquiring Millennial Media or integrating it"); JX1248 (quoting an email from AOL CFO of Platforms Bellomo to another AOL employee: "[I]s our LTP a tough case to achieve on an organic basis?" "[T]he current LTP does not assume any acquisitions . . . .").

mobile supply, shifting demographics, and consumer data.[139] AOL financial advisor

Allen & Co. sent the Management Projections to Verizon, albeit without AOL

management's sign off.[140]

The Deloitte Projections were created after AOL hired Deloitte to perform a

goodwill impairment valuation of the Company using a set of ten-year projections

developed by AOL for this purpose.[141] AOL CFO Dykstra testified that she did not

create the Deloitte Projections for non-tax purposes.[142] These projections were

created through inputs provided by AOL Senior Vice President of Financial

Planning and Analysis Michael Nolan,[143] after which "[Deloitte] . . . r[a]n it through

their standard model."[144] According to Cornell, a DCF analysis based on the

Deloitte Projections—instead of the Management Projections—values AOL stock at

$55.36 per share.[145]

The Disputed Projections were created when Allen & Co. expressed concern,

in April 2015, that AOL's projected working capital "appear[ed] to be materially

---

[139] Trial Tr. 361:19–364:16 (Bellomo); JX1712 at 3 ("Major Product/Solution Improvement Assumptions").

[140] Trial Tr. 889:13–22 (Roszkowski); JX1332; JX1457; JX2991; JX1286.

[141] Trial Tr. 649:19–650:3 (Dykstra).

[142] *Id.* at 653:22–654:10 (Dykstra) ("I wouldn't use them for formal valuation purposes for a different purpose. I mean, this goodwill impairment testing is a different purpose, to just judge whether you have a non-cash impairment charge for that period . . . It was a different process, different people involved.").

[143] Trial Tr. 650:12–13 (Dykstra).

[144] *Id.* at 650:21–23 (Dykstra).

[145] Pet'rs' Opening Br. Ex. A.

different from research estimates"[146] AOL prepared and sent another version of the working capital projections—the Disputed Projections—with different assumptions to Verizon's advisors.[147] AOL CFO of Platforms Nick Bellomo stated that he "reviewed the numbers that were shared [with Verizon] to "mak[e] them more optimistic" in order to "decrease[] the change in working capital, which would have had an increase in cash flow for the business, which would ultimately increase the valuation of the business under certain valuation methodologies."[148] Bellomo stated that it was his "understanding that the valuation that was initially floated to AOL for the purchase of AOL may [have] be[en] taken down unless these numbers were improved."[149] Allen & Co. director Isani explained to AOL Senior Vice President Mark Roszkowski on February 8, 2015 that:

> I think we should be presenting a robust opportunity case to [Verizon]—and as is typical for these processes, it will vary from budget. For internal purposes and record keeping, we should have the bridge btw that case and the board budget as well as document the rationale for the gap.

---

[146] JX1266 (quoting email from Allen & Co. that "[w]e have included [net working capital] from the LRP as well, which appears to be materially different from research estimates, are we sure the numbers we have for NWC are correct?"); *see also* JX2473 (quoting an internal AOL email from May 8, 2015 that the "increase in working capital seems crazy high").

[147] Trial Tr. 371:5–15 (Bellomo); *Id.* at 832:16–833:7, 835:22–836:2 (Allen & Co. director Isani) ("Q. And what do you understand the purpose of these [Disputed] cash flow projections to be? A. To make a case to Verizon on how the cash flow could be improved over time, should the company successfully deploy certain efforts."); *but see id.* at 827:7–828:2 (Isani) (agreeing that "it was typical in these processes to present a robust opportunity case to a potential buyer").

[148] *Id.* at 370:14–18 (Bellomo).

[149] *Id.* at 371:1–4.

However, for the dialogue with [Verizon], we present only the robust case and completely own it as "the" plan. Typically we would not show board minutes as this is not a corporate deal (this case is tricky as the asset represents a large portion of total value). They will ask is this budget and we will have to rehearse the answer. But for a process like this it is not typical for the financials to be revised upward from the conservative board/budget ones

(Should probably also connect w/ legal to get their input into the caveats for documenting the gap).[150]

AOL management sometimes referred to the Disputed Projections as "aspirational" in their internal correspondence.[151] There is also contemporaneous correspondence and trial testimony that the Disputed Projections were created with the assumption that AOL would become part of Verizon.[152]

---

[150] JX0819 at 1–2 (citing emails between AOL and Allen & Co. executives); *accord* Trial Tr. 311:7–312:3 (Doherty).

[151] Trial Tr. 656:19–21 (Dykstra) ("So we did that exercise and came up with a more aspirational set of working capital projections."); JX1691 (quoting a May 10, 2015 email from Dykstra to Roszkowski that "[w]e are going to note to the board at the meeting tomorrow that we provided a more aspirational cash flow to the [Verizon] team as part of the process and we'll need to note the differences at a very high level to the cash flow we provide to the board"); JX1748 (quoting an email from AOL Senior Vice President of Financial Planning & Analysis Michael Nolan to Dykstra on May 10, 2015 that "[b]elow [financial projections] compare[] base case vs aspiration as well as revised tax comment" and refer[] to an assumption that "improved work capital driven by DSO [days sales outstanding] and DPO [days payable outstanding] improvement initiatives planned in LRP," which allegedly could only be achieved by a Verizon acquisition of AOL).

[152] Trial Tr. 656:5–21, 658:23–659:8 (Dykstra) ("I believe they were talking about the exercise of taking a . . . stretch or aspirational approach to looking to see what numbers we could tweak in the model, and things that would be impacted by Verizon if they were there with us . . . . )", 662:4–663:12 ("[W]e went back and said what if we could stretch and Verizon could help us improve some of the dynamics in our cash flow, and collections in particular."); *Id.* at 896:20–897:20 (Roszkowski); JX1690 (quoting same email as JX1691); Trial Tr. 371:16–373:15 (Bellomo); *Id.* at 656:5–657:20, 662:4–663:16 ("Q. And when you wrote about the "more aspirational cash flow given to Verizon," to what are you referring? A. I'm referring to that exercise that we talked about, where we went back and said what if we could stretch and Verizon could help us improve some of the dynamics in our cash flow, and collections in particular."), 695:3–9 (Dykstra) ("Again, I've said that the additional assumptions were assuming we would get better leverage with Verizon.");

I note that other evidence challenges this narrative. The Disputed Projections were created after a rigorous internal process that involved input from a variety of departments within AOL.[153] Certain of AOL's employees signed off on the projections while they were unaware of a potential or likely sale to Verizon.[154] The Disputed Projections were submitted to Verizon and explained to AOL's Board, apparently as though they were current projections.[155] There are emails between AOL employees that refer to the LRP as being "incorrect" and outdated.[156] The

Trial Tr. 835:4–836:2 (Isani); *Id.* at 892:2–10, 893:11–23 (Roszkowski); JX1286 (working capital would improve if AOL had "more leverage on both payment terms and ability to collect . . . ."); JX1452 at 1 (quoting internal LionTree emails in April 2015 that "AOL is assuming . . . more scale" would lead to "a faster collection time"); JX1306 (April 14, 2015 email from Allen & Co. to AOL executives that an assumed change in working capital would be due to "[m]ore leverage over advertisers and publishers"); JX1419 (April 18, 2015 email from Allen & Co. to Verizon financial advisors including a "Net Working Capital Overview" with a "[c]hange in net working capital projections by segment").

[153] JX1280 (noting the Disputed Projections were prepared after "an internal review of the LRP"); JX1423 (quoting an internal AOL email chain discussing the change in projection assumptions in advance of a call); JX1414 (detailing the extensive internal input into the Disputed Projections from Corporate Development, Financial Planning & Analysis, and Allen & Co.); JX1398 at 1 (quoting an AOL finance team email of April 17, 2015 that the updated working capital projections resulted in "no change in AOIBDA [free cash flow] or end cash").

[154] JX1437 (quoting Allen & Co. director Isani in an April 20, 2015 email that: "FYI – [AOL] will also have their controller Lara sweet [sic] join the call at noon. PLEASE NOTE: Lara is not aware of the change in the structure to a 100% deal. As such, please continue to provide the context that the discussion is re: a deal with the last 80/20 public minority structure"); JX1434 at 1 (citing email to show that Lara Sweet, AOL's Controller was unaware of the potential Verizon transaction when she endorsed the Updated Projection); JX1411 at 1 (Armstrong e-mail to the Board, outside counsel, Allen & Co., and Dykstra, and Roszkowski, stating "[i]t is really important you know that the main people represented on this email are the limited set of people that have information on our deals").

[155] Trial Tr. 715:20–716:24 (Dykstra) (agreeing that Dykstra "t[old] the board the difference in cash flows at a very high level" after the Disputed Projections had been sent to Verizon).

[156] JX2451 at 2 (quoting an internal AOL email that "AJ can send you the LRP – caveat being that it is incorrect and does not reflect the updated numbers per all discussions since that time"); JX1406 (quoting internal email from Allen & Co. on April 18, 2015 that "[w]e have already told

Petitioners contend that AOL's goal for more leverage to decrease day sales outstanding (thus decreasing the required working capital and thereby improving cash flow) could have occurred outside of an anticipated deal with Verizon, although an exact method is left unspecified.[157]

I find that the Management Projections are in fact management's best estimate as of the Valuation Date. While a close call, the record indicates that the Disputed Projections were most likely created as a marketing tool in AOL's attempted sale of itself to Verizon. My purpose here is to determine the fair value of AOL, and not AOL's value as-advertised. I am not persuaded that the Disputed Projections represent the most recent and valid projections used by AOL management prior to the Valuation Date.

Finally, I find that the goodwill impairment projections are not pertinent to my DCF analysis here. The purpose behind any set of projections matters because it determines the appropriateness of various assumptions that must be made. The Deloitte Projections were made for the goodwill impairment analysis—a tax-driven assessment with a host of required assumptions that should not, in these circumstances, be used for a DCF analysis. While certain assumptions may be

---

[Verizon] all old numbers should be disregarded as they are not correct, however they would still like to have a call").

[157] Pet'rs Answering Post-Trial Br. 17 ("The documents cited by Respondent generally assert that working capital would improve if AOL had more scale or leverage (which AOL could obtain in ways other than an acquisition by Verizon) among several other strategies AOL had employed to improve working capital.").

appropriate for a tax analysis, those same assumptions may be nonsensical for valuation purposes. Consequently, I use the Management Projections in my DCF analysis.

## 2. Pending Transactions as of the Merger

I start with the following assumptions. "The determination of fair value must be based on all relevant factors, including . . . elements of future value, where appropriate."[158] "[A]ny . . . facts which were known or which could be ascertained as of the date of the merger and which throw any light on [the] future prospects of the merged corporation" must be considered in fixing fair value.[159] A corporation "must be valued as a going concern based upon the 'operative reality' of the company as of the time of the merger."[160] I must exclude speculative costs or revenues, however.[161] Mere "actions in furtherance" of a potential transaction, without a manifest ability to proceed, should not be valued as part of a company's operative reality.[162]

---

[158] *Glassman v. Unocal Exploration Corp.*, 777 A.2d 242, 248 (Del. 2001).

[159] *Montgomery Cellular Holding Co.*, 880 A.2d 206 at 222 (Del. 2005).

[160] *Ala. By-Prods. Corp.* v. *Neal*, 588 A.2d 255, 256–67 (Del. 1991); *M.G. Bancorporation, Inc*, 737 A.2d at 525; *LongPath Capital, LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443, at *9 (Del. Ch. June 30, 2015).

[161] *Ramtron*, 2015 WL 4540443, at *13 & n.113; *see also M.G. Bancorporation, Inc.*, 737 A.2d at 525; *Ala. By-Prods. Corp.*, 588 A.2d at 256–67.

[162] *Gearreald v. Just Care, Inc.*, 2012 WL 1569818, at *6 (Del. Ch. Apr. 30, 2012).

The Petitioners argue that three potential deals were part of AOL's operative reality, and that any fair value analysis of AOL must include these transactions.[163] These include: (i) AOL's acquisition of Millennial, a programmatic mobile advertising platform;[164] (ii) a deal for Microsoft's Bing search engine to replace Google in powering search results on AOL properties (the "Search Deal"),[165] and (iii) a ten-year commercial partnership for AOL to run the sales of display, mobile, and video ads on Microsoft properties in the United States and eight international markets (the "Display Deal") (the Display Deal and Search Deal are together referred to as the "Microsoft Deals").[166] Fischel did not ascribe value to these transactions in his DCF analysis.[167] For each of these transactions I ask: (i) if the transaction was part of the "operative reality" of the Company as of the Valuation Date, and (ii) if so, was the transaction appropriately valued in the LTP. I will adjust my Fischel-based DCF analysis to include the financial impact of those transactions that were part of the Company's operative reality on the Valuation Date but which were not included in the LTP.

[163] Pet'rs' Answering Br. 47.
[164] JX2076 at 2–3 (citing August 25, 2015 internal Verizon proposal for merger agreement with Millennial); Trial Tr. 48:6–7 ("Millennial Media . . . is basically a programmatic mobile platform . . . .").
[165] JX2008 (including an "Advertising Sales and Services Agreement" executed on June 30, 2015).
[166] JX2441 (including a "Sales Partnership Agreement for AOL's Operation of [Microsoft's] Display and Video Advertising Monetization" executed on June 23, 2015).
[167] *See* JX2346 (LTP) at Tab I. A.2 Key assumptions (displaying unawareness of Search Deal in statement that "[n]ew search deal terms set in for 2016. This will negatively impact revenue and bottom line for Core").

### a. Operative Reality

#### i. Description of the Deals

As mentioned, the Display Deal allowed AOL to run the sale of display, mobile, and video ads on Microsoft properties such as Xbox, Skype, Outlook, MSN, and others in the United States and eight other markets.[168] After months of negotiation,[169] Microsoft and AOL traded draft term sheets at least through May 2015.[170] Armstrong testified that the Display Deal "could have blown up at any time" because of, among other things, uncertainty surrounding the customers and the Microsoft employees AOL would need to onboard.[171] Armstrong confirmed in a May 14, 2015 email that AOL expected to close the Display Deal on May 27, 2015.[172] Nevertheless, AOL pushed back the Microsoft announcement until after the Verizon announcement.[173] AOL signed an agreement for the Display Deal with Microsoft on June 28, 2015 and announced the transaction on June 30, 2015.[174] The

---

[168] JX2441.

[169] JX2009 at 1 (quoting AOL executive that the MSFT deal "was 9 months of long drawn out internal and external negotiation").

[170] JX2412 (citing May 7, 2015 email from Bain to AOL: "Deal terms are still in flux; we anticipate having final terms on Friday 5/8, with some work still to be done on PMP terms."); JX2413 (quoting May 8, 2015 internal AOL email with "the latest term sheet" with updates about "[AOL's] latest reconciliation on terms with [Microsoft]").

[171] Trial Tr. 510:4–8, 12–13 (Armstrong).

[172] JX1816 at 1 (email from Armstrong to AOL executives on May 14, 2015).

[173] JX2425 (quoting email from AOL executive Roszkowski to another AOL employee on June 2, 2015 to hold off on announcing the Display Deal until after the Verizon announcement).

[174] JX2008 at 38–39 (Display); JX1997.

Petitioners imply that the Display Deal contributes $2.57 per share if included under Fischel's DCF Model.[175]

The Search Deal replaced a soon-to-expire contract with Google to allow Microsoft's Bing search engine to power advertising and results on AOL's properties.[176] Similar to the Display Deal, AOL planned to close the Search Deal on May 27, 2015 but delayed until after the Verizon announcement.[177] An AOL presentation from June 10, 2015 included the key terms, financial projections, and other business implications of the Search Deal.[178] The Search Deal closed on June 26, 2015.[179] Microsoft and AOL announced the Microsoft Deals on June 30, 2015.[180] The Petitioners do not quantify the impact of the Search Deal but instead urge me to "select a DCF value slightly above the median to account for the value added by the Microsoft Search Deal, which was accretive to free cash flow beginning in 2016."[181]

---

[175] Pet'rs' Answering Br. 46–47 (stating that the Millennial and Display Deals contribute $6.71 per share and that the Millennial Deal accounts for $4.14 per share of that contribution). I note that Cornell examines the Millennial and Display Deals as combined. Pet'rs' Post-Trial Answering Br., Ex. A.

[176] JX2008; Trial Tr. 512:12–20 (Armstrong); JX2146.

[177] JX1816 at 1 (email from Armstrong to AOL executives on May 14, 2015); JX2425 (quoting email from AOL executive Roszkowski to another AOL employee on June 2, 2015 to hold off on announcing the Display Deal until after the Verizon announcement).

[178] JX2433.

[179] JX2146 at 1–2 (including a copy of the Search Deal agreement); JX1997 (including an internal AOL email circulating the signature pages). The parties dispute whether the Search Deal closed on June 26 or 28, 2015; the distinction is not material to my decision here.

[180] JX2008; JX2146.

[181] Pet'rs' Answering Br. 47.

The path of Millennial Media, Inc. ("Millennial") to an acquisition by AOL (the "Millennial Deal") was more circuitous than the Microsoft Deals. After conducting initial diligence, AOL passed on buying Millennial in late 2014 but resumed preliminary diligence in February 2015.[182] AOL paused its diligence in April 2015 until Millennial announced its quarterly earnings.[183] In May 2015, Armstrong told the AOL Board that Millennial might "secure another offer in the near term, but we are willing to take that risk."[184] Armstrong made a non-binding offer to Millennial for $2.10 per share on June 5, 2015, "conditioned on exclusivity," and stated that "AOL was prepared to move expeditiously to negotiate and sign a definitive agreement to effect the transaction."[185] AOL sent a "written, non-binding proposal . . . reflecting the terms of the June 5 Proposal, and which also included an exclusivity period to negotiate a transaction between the parties until July 17, 2015."[186] On June 10, 2015, Millennial opened a data room to AOL and its advisors.[187] On June 15, 2015, Millennial and AOL signed an agreement to negotiate exclusively until July 17, 2015, and "which contained a standstill provision that would terminate if the Company entered into a definitive agreement with a third

---

[182] JX0663 at 1; JX2112 at 14.
[183] JX1476 at 1.
[184] JX1595 at 2.
[185] JX2112 (Millennial Schedule 14D-9) at 17.
[186] *Id.* at 18.
[187] *Id.*

party to effect a business combination."[188]  Representatives of AOL and Millennial

met on June 17–19, 2015 to discuss Millennial's "financials, business operations,

product and technology, real estate and security infrastructure."[189]  On June 23,

2015, Verizon closed the merger with AOL.[190]

On June 30, 2015, AOL's counsel "circulated a first draft of the Merger

Agreement," followed by two weeks of meetings, discussions, and negotiations.[191]

The parties discussed:

> [T]he scope of the representations and warranties, the benefits to be
> offered to the Company's employees following the transaction, the
> conduct of the Company's business between signing and closing of the
> transaction, the parties' respective conditions to closing, AOL's
> obligation to indemnify and maintain insurance for the Company's
> directors and officers, the rights of the parties to terminate the
> transaction, and the amount and conditions of payment by the Company
> of the termination fee and expense reimbursement described above.[192]

The SEC sent Millennial a letter "notifying [Millennial] that the SEC was conducting

an information investigation" for fraud starting in July 2015.[193]  After the expiration

of the exclusivity agreement, Millennial attempted to auction itself to six other

buyers, but AOL was the only party to submit a proposal.[194]  AOL, by then under

Verizon, agreed to pay $1.75 per share to acquire Millennial on September 2,

---

[188] *Id.* at 19.
[189] *Id.*
[190] Stipulated Joint Pre-Trial Order ¶ 9.
[191] *Id.*
[192] *Id.* ¶ 20.
[193] JX2112 (Millennial Schedule 14D-9) at 19–20.
[194] *Id.* at 20–24, 26 ("AOL was the only party to submit a proposal to acquire Millennial");

2015.[195] AOL signed the Millennial Deal on September 3, 2015.[196] The Millennial Deal closed on October 23, 2015.[197] The Petitioners argue that the Millennial Deal contributes $4.14 per share if included under Fischel's DCF model.[198]

## ii. Conclusions

I find that the Display Deal was part of the operative reality of AOL as of the Valuation Date. I am persuaded by the level of certainty in that transaction, given AOL's internal correspondence and the concrete plans for an announcement date. I also find that the Search Deal was part of the operative reality of AOL as of the Valuation Date. I am persuaded by the apparent certainty of the transaction, based on internal correspondence and presentations, that this transaction was one that both sides fully expected to occur. However, I find that the Millennial Deal was not part of AOL's operative reality as of the Valuation Date. AOL had taken a number of steps toward a transaction, such as sending a non-binding offer subject to an exclusivity period, beginning the due diligence process, and meeting with executives. However, no merger agreement drafts had been exchanged and weeks of negotiations, a robust due diligence process, and an entire auction yet remained. The actions taken by AOL before the Valuation Date showed substantial interest in

---

[195] *Id.* at 23; JX2988.
[196] JX2112 at 25.
[197] JX2130 at 2.
[198] Pet'rs' Answering Br. 47.

a transaction but are not, to my mind, sufficiently certain as to be part of the operative reality of AOL on the Valuation Date.

### b. LTP Assumptions

The second question is whether the operative reality of AOL as of the Valuation Date, including the relevant transactions mentioned above, was properly included in the LTP. Because I find that the Millennial Deal was not part of the operative reality of AOL on the Valuation Date, I need not answer the second question for that particular transaction. In essence, the question before me is this: what is the scope of the assumptions made in the LTP? The Petitioners urge me to view them narrowly—these specific deals were not assumed—making the Microsoft Deals additive to the Management Projections. The Respondent, by contrast, urges me to view them broadly—the LTP assumes that strategic gaps will be filled and these transactions merely fill that role—so that the LTP remains as management's best prediction of future cash flows and the Microsoft Deals should not be additive. My attempt to differentiate the new ingredients from those already baked in is below.

### i. The Display Deal

The Display Deal and its relation to the LTP were specifically discussed internally after the AOL-Verizon merger. AOL executive Roszkowski explained to Verizon executive Walden in a September 3, 2015 email that the Microsoft and Millennial Deals were "*accretive* to [the LTP], but should *not* be a *straight addition*

to revenue and margin" and that "the [] LTP assumed deals like MSFT and that [AOL] would close [its] mobile technology/talent gap."[199] Roszkowski later testified that AOL's LTP was "optimistic . . . and . . . included assumptions that [AOL] [would] solve[] for key strategic capability gaps" so that the Microsoft Deals "actually made the long-term plan more certain" and could not be a "straight . . . addition" to the LTP.[200] The Display Deal included a number of risks, including adding approximately 1,270 Microsoft employees in nine countries.[201] The parties also dispute smaller, non-dispositive issues.[202]

The parties give me two choices with regard to the Display Deal: add the full value of the Display Deal as urged by the Petitioners, implicitly worth $2.57, or decline to add it to the LTP, as the Respondent recommends. I find that the Display

---

[199] JX2100 at 1 (emphases added); *see also* Trial Tr. 578:15–579:17, 582:7–18 (Doherty) ("Q. And in your view, Mr. Doherty, could you simply add the projections relating to the new Microsoft deal on top of the prior management projections? A. No. Not at all. I mean, two reasons. Number one, I felt it was already pretty much baked into their plan; and, number two, we didn't have a set of projections.").

[200] *Id.* at 901:3–14 (AOL head of corporate development Roszkowski); *see also id.* at 343:1–7 (Verizon EVP Walden); *Id.* at 314:1–19 (Verizon SVP Doherty).

[201] Tr. 374:15–375:12 (Bellomo); Tr. 512:2–513:8 (Armstrong); JX1993 at 6, 13–15 (quoting a June 25, 2015 internal Verizon slide deck explaining the deal and its risks and benefits to AOL and Verizon, including employee integration schedules); JX2008 at 9–16, 22–23 ("Advertising Sales and Services Agreement" between AOL and Microsoft dated June 30, 2015).

[202] The parties dispute the meaning of "delivered value" in an exhibit (JX2436) as either "revenue that is delivered to AOL and Microsoft on account of the deal" (Resp't's Answering Br. 57) or "by definition . . . additive" (Pet'rs' Opening Br. 59). The parties also dispute a slide (JX2441 at 8) that was either "apparently put together by a Bain consultant and never shared outside a small group of AOL's management, showing how AOL might be able to perform as part of Verizon, with illustrative numbers added on to AOL's long-term plan" (Resp't's Answering Br. 57) or as evidence that AOL viewed the Display and Millennial Deals as directly additive to the LTP (Pet'rs' Opening Br. 59–60).

Deal was, at least, partially accretive. I am convinced that AOL internally viewed it as at least partially additive to its LTP as evidenced by its internal presentations and communications, but I also suspect that it should not be *entirely* additive. Because I lack the information necessary to cut a finer slice in this instance, I add the full $2.57 per share to my DCF analysis. In other words, the record gives me no basis that another value for the display deal is less arbitrary than $2.57 per share.

### ii. The Search Deal

Neither Fischel nor Cornell included the Search Deal in their DCF analyses,[203] purportedly because "AOL did not produce detailed forecasts for the Search Deal."[204] The LTP initially assumed that a new search deal with Google would be less favorable to AOL than the previous deal.[205] Armstrong testified that the Search Deal, together with the Display Deal, was "meant as a mitigation to the search money that we would lose when we switched from Google at the end of that year to Microsoft. But it was unlikely that the Microsoft deal would make up for the search loss that we were going to experience overall."[206] However, a June 10, 2015 AOL presentation included financial projections that explicitly portrayed the Search Deal

[203] Trial Tr. 232:18–19 (Cornell); JX2255 ¶ 41 n.90 (Fischel Report).
[204] Pet'rs' Opening Br. 56.
[205] JX2346 at Tab I. A.2 Key assumptions [for AOL's LTP] ("New search deal terms set in for 2016. This will negatively impact revenue and bottom line for Core.").
[206] Trial Tr. 512:12–20 (Armstrong).

as *additive* to AOL's OIBDA in comparison with the LTP.[207]

I find that the preponderance of the evidence shows that the Search Deal is, at least minimally, additive to the LTP. The record is lacking in a principled way to account for the Search Deal, however. The Petitioners do no more than urge me to "select a number slightly higher than the mid-point share price to account for the Search Deal's benefits."[208] I find fair value, therefore, is best expressed by omitting any speculation as to the value to AOL of the pending Search Deal. In other words, the record gives me no basis to find that another value for the Search Deal is less arbitrary than $0. I also note that I have included the full value of the Display Deal as accretive to value, potentially overstating fair value, and I find it prudent not to exaggerate that effect by adding speculative value here.

### 3. Projection Period

Any DCF analysis must include a post-projection period of valuation into perpetuity at a steady state. This case is a now-classic appraisal story of "the tale of two companies." AOL was divided into three segments: two parts small and rapidly growing; one senescent. The question before me is, in the context of four-year projections, ending with two segments enjoying high growth rates and a quiescent third segment, what is the best way to view the terminal period?

---

[207] JX1906_VZ-0056420 at 5–6 (comparing difference in Search Deal projections to "AOL May 2015 Outlook + 2016–18 Long Term Plan").

[208] Pet'rs' Opening Br. 56.

Fischel selected 3.25% as the perpetuity growth rate for AOL.[209] Fischel noted that the "perpetuity growth rates reported by analysts and advisors ranged from 1.0% to 6.6%, with a median of 2.5% and an average of 2.9%."[210] Fischel then averaged the 2.9% perpetuity growth rate given by analysts and advisors with the 4.6% long-term GDP growth estimate and 2.3% long-term inflation rate, resulting in an average rate of 3.28%.[211] Fischel reduced the perpetuity growth rate to 3.25% due to his concern that "AOL's Membership segment was the largest contributor to AOIBDA and was declining, so this may overstate the expected growth rate for the firm."[212] However, Fischel noted that because "AOL Projections do not provide estimates beyond 2018 . . . there is some possibility that AOL could experience growth in the short term at a rate higher than inflation due to higher growth in the Platforms and Brands segments or even potential acquisitions."[213] Lastly, Fischel tested the "sensitivity of the implied value of AOL's common shares to the perpetuity growth rate by using a range of 3.0% to 3.5%."[214]

Unsurprisingly, the Petitioners characterize Fischel's perpetuity growth rate of 3.25% as "flawed" because, they say, combined with his use of a two-stage model, Fischel insufficiently accounts for AOL's high growth rate prior to reaching steady

---

[209] JX2255 ¶ 54 (Fischel Report).
[210] *Id.* ¶ 52.
[211] *Id.* ¶ 54.
[212] *Id.* ¶ 54 n.104.
[213] *Id.* ¶ 53.
[214] *Id.* ¶ 54 n.104.

state.[215]  The Petitioners argue that a three-stage DCF is more appropriate here because "academic literature [such as that by Professor Damodaran] counsels that if the growth in the final forecast year is well above the terminal growth rate, then a three-stage model is preferred."[216]  The Petitioners point to Fischel's agreement, that two of the AOL businesses were experiencing "hypergrowth"[217] at the end of the two-stage projection period used by Fischel, as evidence that a two-stage model is inappropriate here.[218]  The Petitioners illustrate this lost value using a chart:[219]



[215] Pet'rs' Post-Trial Opening Br. 64.
[216] Id. at 65.
[217] Trial Tr. 1105:20–1106:2 (Fischel) ("Q. Okay. Now, two of the AOL business segments experienced hypergrowth at the end of the projection period that you used. Correct?  A. That's right.  Q. And AOL did not reach a steady state at the end of the projection period. Correct?  A. I think that's fair.").
[218] Pet'rs' Post-Trial Answering Br. 50.
[219] Pet'rs' Post-Trial Opening Br. 66.

As an alternative, the Petitioners advocate using the ten-year Deloitte projections used for the tax impairment analysis to account for the post-Management Projections growth gap described above.[220] I have already rejected this approach, for reasons set out above; I also note that AOL management did not believe it could reliably forecast beyond four years.[221]

In a fast-paced industry with significant fluctuations, where management is hesitant to project beyond four years, using a three-stage DCF model or a ten-year projection period seems particularly brazen. I find that a two-stage model is appropriate under these circumstances. However, I agree with the Petitioners that Fischel's two-stage model and perpetuity growth rate of 3.25% do not accurately capture the trajectories of the two divisions of AOL that were in hypergrowth at the end of the Management Projection period, despite the presence of the aforementioned senescent "You've Got Mail" laggard. I find a perpetuity growth rate of 3.5% more accurately captures AOL's prospects after the Management

---

[220] *Id.* at 66–67; JX2277 (Cornell Report) ¶¶ 89–92.

[221] Resp't's Opening Post-Trial Br. 74; Trial Tr. 642:11–23 (Dykstra) ("Q. Why did you only project out four years as part of the long-term planning process? A. It was very difficult to go beyond four years. You know, we were in businesses and markets where the world was changing pretty quickly. I mean, digital marketing really was just coming into play, so it was moving fast. We -- it's difficult to predict advertising trends to begin with."); JX2233 at 112:22–113:5 (Eoin Ryan Dep., former AOL head of investor relations and now AOL head of financial planning); Trial Tr. 642:11–23 (Dykstra); JX2233 at 112:22–113:5 (Ryan Dep.).

Projection period ends. When a 3.5% perpetuity growth rate is applied to Fischel's DCF model, the fair value of AOL stock increases by $1.28 per share.[222]

### 4. Cash Balance

The value of working capital that is required "to fund [a company's] ongoing operations . . . is already reflected in one sense in the discounted present value of those operations."; any balance of cash not so required is "'excess' and may be added to the discounted cash flow."[223]  Fischel and Cornell agree that any such balance should be added back to the valuation for AOL after the DCF analysis.  Fischel cites to Professor Aswath Damodaran for the financial valuation rule that "only cash in excess of the minimum cash balance needed for operations should be included in a DCF."[224]

The cash on hand of the Company on the Valuation Date was $554 million.[225] Fischel adds $404 million at the end of the DCF but reserves $150 million as working

---

[222] I use the Fischel model the parties provided to calculate my DCF.  I note that Fischel's model includes a broken reference (#REF!) in Ex. N on the "AOL Dilutive Results (lexicon)" tab at cell BJ4.  The reference impacts calculations made in the "DCF" tab regarding the shares outstanding at cell B16.  I input "85.1" into cell B16 in accordance with Fischel's Report at JX2255 ¶ 57, which states that "AOL had approximately 85.1 million fully diluted shares outstanding as of the Valuation Date."  The result was a $1.28 per share difference when applying a 3.5% perpetuity growth rate, or $46.13 per share.  The parties may address any concerns with this approach before the Final Order.

[223] *Neal v. Ala. By-Products Corp.*, 1990 WL 109243, at *16 (Del. Ch. Aug. 1, 1990), *aff'd,* 588 A.2d 255 (Del. 1991).

[224] JX2255 at 36 (citing Aswath Damodaran, *Dealing with Cash, Cross Holdings and Other Non-Operating Assets: Approaches and Implications*, working paper, Sept. 2005, at 12) ("Damodaran").

[225] JX2255 (Fischel Report) ¶ 55 (including "cash and equivalents of $530 million plus assets held for sale of $24 million").

capital, an asset necessary to develop the return on investment that is represented in the DCF.[226] Cornell adds back AOL's entire cash balance of $554 million.[227] The Petitioners contend that the $150 million "minimum balance" is "litigation driven"[228] by pointing to (i) Verizon's and AOL's advisors purportedly opposite position in their valuations[229] and (ii) AOL's historic dips below $150 million cash on hand in 2014.[230] They contend that *none* of this cash should be excluded and that *no* working cash exclusion is appropriate.

I am not persuaded that, in evaluating the fair value of AOL under these circumstances, I should add back all of the cash of AOL, implicitly assuming that zero working capital would be required to achieve the returns that the DCF analysis projects. While I recognize that AOL dropped below $150 million in cash in the recent past, which the Petitioners point to as evidence that the minimum cash balance is a litigation façade, I also acknowledge that historical dips in cash reserves pertain to a different time period with different capital requirements. The preponderance of

---

[226] *Id.*

[227] JX2277 (Cornell Report) at 134.

[228] Pet'rs Post-Trial Opening Br. 69.

[229] *See* JX1546 at 12 (Guggenheim) (showing $477 million cash in an enterprise value analysis); JX2319 (Allen) at Tabs "WholeCo Multiple Val," "SOTP-Mult" (showing each as incorporating $493 million cash under a multiple-based valuation analysis), "WholeCo DCF (Old CF)," (including $493 million cash in calculating the weighted average cost of capital). I note that the Petitioners do not clearly point to an example of where Allen & Co. added back all of AOL's cash balance after a DCF analysis.

[230] *See, e.g.*, JX2267 (excerpt of AOL June 30, 2014 10-Q showing cash and equivalents of $136.2 million); JX2268 (excerpt of AOL March 31, 2014 10-Q showing cash and equivalents of $123.5 million); Trial Tr. (Dykstra) 764:1–2 ("I don't remember when we first came up with the [$150 million] minimum cash [goal].").

49

the evidence indicates that this not a litigation-driven argument.[231] I instead find that the withholding of $150 million as working capital is reasonable and decline to add it back into the DCF.

## IV. CONCLUSION

In arriving at fair value, for the reasons discussed above, I give full weight to my DCF valuation. I begin with Fischel's DCF valuation of $44.85 and add $1.28 per share[232] for the adjustment to a 3.5% perpetuity growth rate and $2.57 per share to include the Display Deal as part of AOL's operative reality. My DCF analysis therefore results in a fair value of $48.70 per share. While the deal process was not *Dell* Compliant and thus not entitled to deference as a reliable indicator of fair value, it was sufficiently robust that I use the deal price as a "check" on my analysis, while granting it zero explicit weight. I note that value derived from my DCF does not deviate grossly from the deal price of $50.

I am cognizant, however, that I am saying two seemingly incongruent things; namely, that AOL's deal process was insufficient to warrant deal price deference at $50 per share—because, due to deal deficiencies, the sales price may not capture the full fair value of the Company—while also holding, based on my DCF analysis, that

---

[231] Trial Tr. 765:4–7 (AOL CFO Karen Dykstra) ("I said we had a goal of maintaining $150 million. We felt that that should be our minimum cash balance. We felt that that was prudent."); JX00921 at 31 (Feb. 27, 2015 AOL Board Agenda: "To balance our growth strategy with cash management objectives, our goals are to maintain . . . at least $150m of cash on hand, using the credit facility for strategic transactions (share repurchases and M&A transactions).").
[232] *See supra* note 222.

50

the value of AOL stock is even *lower*, at $48.70 per share.  One explanation for this incongruity is that a deal price may contain synergies that have been shared with the seller in the deal but that are not properly included in fair value.

For the reasons described above, I hold that the fair value of AOL stock was $48.70 per share on the Valuation Date.  The Petitioners are entitled to the fair value of their shares together with interest at the statutory rate.  The parties should confer and provide a form of order consistent with this Memorandum Opinion.